UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Yuri Kuklachev, Dmitri Kuklachev,

                          Plaintiffs,

        - against –                                    08-CV-2214 (CPS)

Mark Gelfman, Gelfman International
Enterprises, Inc., Yanis Gelfman,           MEMORANDUM OPINION
Tribeca Performing Arts Center,             AND ORDER
Ticketmaster.com, Palace of Fine Arts,
Wilkins Theater at Kean University,
Onlineseats.com, John Hancock Hall,
Gwinnett Center, Napa Valley Opera
House, LA's Wilshire Ebell's Theater,
Seattle Repertory Theater, Dmitry
Krassotkine, Yuri Potoski, Michael
Zlotnikov, Andrew Yankovis, Stanislav
Nemoy,Vladimir Krasnolozhkin, Vladimir
Anisimov,

                          Defendants.

------------------------------------X
SIFTON, Senior Judge

        Yuri Kuklachev and Dmitri Kuklachev ("plaintiffs") commenced

this action against defendants Mark Gelfman ("Gelfman"), Gelfman

International Enterprises, Inc. ("Gelfman Inc."), Yanis Gelfman,

Tribeca Performing Arts Center, Ticketmaster.com, Palace of Fine

Arts, Wilkins Theater at Kean University, Onlineseats.com,

Tillinger's Concierge, Inc. ("Tillinger's"),[1] Gwinnett Center,

------------------------------------

        [1] The plaintiffs originally named John Hancock Hall as defendant.
However, the parties have stipulated and agreed that the defendant named as
John Hancock Hall in this matter is not an entity, but is instead a location.
The parties have further stipulated and agreed that Tillinger's operated John
Hancock Hall, was served with the complaint, has answered the complaint, is
the real party in interest, and should be substituted for John Hancock Hall.

Napa Valley Opera House, The Ebell Operating Company,[2] Seattle
Repertory Theater, Yuri Potoski ("Potoski"), Michael Zlotnikov
("Zlotnikov"), Andrey Yankovis ("Yankovis"), Stanislav Nemoy
("Nemoy"), Vladimir Krasnolozhkin ("Krasnolozhkin"), Vladimir
Anisimov ("Anisimov"), Dmitry Krassotkine ("Krassotkine"), other
as yet unidentified persons and companies, and the State of New
Jersey (collectively, "defendants"), on June 2, 2008.[3] Plaintiffs
make the following claims in their complaint against each of the
defendants: (1) federal trademark infringement under the Lanham
Act, 15 U.S.C. § 1114; (2) false representation under the Lanham
Act, 15 U.S.C. § 1125(a); (3) unfair competition and false
designation under the Lanham Act, 15 U.S.C. § 1125(a); (4)
trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c);
(5)cybersquatting in violation of the Lanham Act, 15 U.S.C. §
1125(d); (6) violation of privacy and publicity rights under the
New York Civil Rights Law, Article 5, § 50 and § 51, N.Y. CLS
Civ. R. § 50, 51; (7) injury to business reputation and trademark
dilution under N.Y. GBL § 360-L; (8) unfair competition and false
advertizing under the New York Unfair Trade Practices Law, GBL §
349-50 and New York City Administrative Code § 20-700, § 20-701;
(9) unfair competition under New York common law; (10) unjust

---

[2]This party was sued under the name LA's Wilshire Ebell's Theatre, but
that is a description of the location, not a business entity. The Ebell
Operating Company owns and operates the Wilshire Ebell Theater.

[3]Krasnolozhkin and Anisimov have not yet been served and will not be
treated as defendants for the purposes of this motion.

enrichment under New York common law; (11) copyright infringement; (12) trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a); (13) fraud; (14) conversion; (15) fraud in trademark application;[4] and (16) prima facie tort.

Now before the court is plaintiffs' motion for a preliminary injunction against all defendants who have been served, other than Tribeca Performing Arts Center, Tillinger's, and Nemoy,[5] seeking to restrain them from making use of plaintiffs' marks in connection with the allegedly infringing shows, from distribution or advertising of the allegedly infringing shows, from making false and misleading statements regarding the origin of the shows, from using domain names claimed by plaintiffs, and impounding tangible property held by defendants belonging to plaintiffs.

Based on the findings of fact and conclusions of law and for the reasons set forth below, the motion is granted in part and denied in part.

### BACKGROUND

The following facts are taken from the plaintiffs' complaint and both sides' submissions in connection with this motion. Disputes are noted.

---

[4]Alleged against Mark Gelfman only.

[5]At oral argument the plaintiffs stated that they were not seeking preliminary injunctive relief against these defendants.

*The Parties*

Yuri Kuklachev ("Kuklachev") is a Russian national who tours the world with his troupe of cats and clowns, putting on theatrical performances. Kuklachev performs in the shows, manages the troupe, and organizes performances. Dmitri Kuklachev is Yuri Kuklachev's son, and is the artistic director and star performer of the troupe.

Defendant Mark Gelfman is the president of Gelfman Inc., a promotional and management business for entertainments. Yanis Gelfman is Mark Gelfman's son and the general manager of Gelfman Inc. All three of these defendants are collectively referred to as "the Gelfmans."

Defendants Palace of Fine Arts, Wilkins Theater at Kean University (an entity of the State of New Jersey), Gwinnett Center, Napa Valley Opera House, Wilshire Ebell Theater, and Seattle Repertory Theater are venues that plaintiffs claim hosted shows produced by the Gelfmans that allegedly infringed upon plaintiffs' trademarks.

Defendants Onlineseats.com and Ticketmaster.com are online ticket vendors that plaintiffs claim sold tickets to the allegedly infringing shows.

Defendants Yuri Potoski, Michael Zlotnikov, Andrey Yankovis, Stanislav Nemoy, Vladimir Krasnolozhkin, Vladimir Anisimov, and Dmitry Krassotkine were performers and crew members in the

production of the allegedly infringing show.

*Historical Background*

In the early 1970's, plaintiff Kuklachev, a well-recognized clown, became known for public entertainments performed with his troupe of cat performers and clowns. Complaint at ¶ 44 ("Compl."). Rather than training the cats to perform tricks, Kuklachev allegedly selected his cats for each role based on their individual skills and preferences, much like actors in a theater. *Id.* at ¶ 45. By the mid-1970's, Kuklachev's cat performances were a recognized success in various countries and in the United States. *Id.* at ¶ 46. Excerpts from Kuklachev's shows have been shown on television stations in various countries, including the United States, and have been discussed in multiple entertainment news reports. Compl. at ¶ 46. In the former USSR, Kuklachev's performances were included in children's television shows, official state concerts, and transmitted on Soviet television channels. *Id.* Busts and action figures of Kuklachev with his cats were created in Russia and exported to other countries. *Id.* Plaintiffs won numerous entertainment awards for their work. *Id.* at ¶ 49.

The cat troupe is and has always been housed in Moscow. Supplemental Declaration of Yuri Kuklachev at ¶ 2 ("Supp. Kuklachev Decl."). The theater employs performers, stage workers,

cat care assistants, and other staff. *Id.* It is a popular tourist destination, and is apparently the only venue in the world that specializes in performances by cats. *Id.* at ¶ 3; Compl. at ¶ 50.

Kuklachev first toured the United States in 1977, and returned to the United States again in 1980. Compl. at ¶ 47. Thereafter, Kuklachev returned to the United States with his cats in 2001, 2002, 2005, and 2006. Plaintiffs' Reply to Gelfmans' Opposition to Preliminary Injunction Motion, Ex. H ("P. Reply to Gelfman.").

*2005 and 2006 Tours*

In 2005 and 2006, Kuklachev brought his performance to the United States for an extended tour, during which there were numerous successful performances, all under the name of "Moscow Cats Theatre." *Id.* at ¶ 50. Kuklachev does not speak English, and did not know how to book, organize, and advertise a tour in the United States. Supp. Kuklachev Decl. at ¶ 1. Kuklachev required a promoter who could speak both Russian and English and communicate his terms and requirements to advertisers and theaters, and hired Gelfman for this purpose. *Id.* Plaintiffs claim that Gelfman later created a show that imitated plaintiffs' show, including tricks, costumes, and the Moscow Cats Theatre name. In contrast, Gelfman claims that he contacted Kuklachev in late 2004 or early 2005 to ask whether Kuklachev would be interested in working for Gelfman

Inc. as a performer in a variant of the circus cats routine that
Kuklachev performed in Russia that would tour the United States.
Gelfman Decl. at ¶ 3.

For the 2005 and 2006 tours, Yuri Kuklachev and Gelfman Inc.
signed a contract.[6] The contract designates Gelfman Inc. as
"Promoter" and Yuri Kuklachev as "Artist," and states that the
document is a "performance agreement" for the performance of
"Kuklachev's Cat Theater," which is called the "Show" (Dmitri
Kuklachev was not a party to this contract). Gelfman Aff. Ex. A.
The duration of the contract was from September 9, 2005 to
September 9, 2007. The contract states that the "Promoter engages
Artist to perform the Show," and refers to the Show as a product
of "[the Artist's] theater." *Id.* at 2. The Promoter agrees not to
"contract with or promote any other performances [inside the
United States] during the duration of this Agreement... that
utilizes animals as the essential and predominant part of their
performance." *Id.* The promoter "has no right to engage any other
artist" to work in the Show or to be included in performances.
*Id.* The contract states that "[t]he services provided by Artist
and his Members are special, unique, unusual, extraordinary, and
posses an intellectual character that gives them their particular
value." *Id.* at 4. Furthermore, "Artist shall have the sole and
exclusive control of the presentation and control of the show."

---

[6]The contract is undated.

*Id.* at 5. The contract states that the Artist will provide the Promoter with information, photographs, and other information for the purpose of advertising the show. *Id.* at 6. The Promoter promises up to three minutes of video recording of the show for use in advertising. *Id.* The Promoter agrees to pay for living expenses, animal and veterinary expenses, travel expenses, laundry expenses, and commercial liability insurance. *Id.* at 7-9.

Gelfman states that during the summer of 2005, he decided to call the new production the "Moscow Cats Theatre." *Id.* at ¶ 6. A wire transfer payment made on March 1, 2006 lists the payment as being paid by "Gelfman International" to "Moscow Cats Theatre by Yuri Kuklachev" at the Bank of Russia. P. Reply to Gelfman Ex. A.

Upon Kuklachev's arrival in the United States in 2005, major news outlets in the United States published stories about Kuklachev and his many years of work with the Moscow Cats Theatre. Compl. at ¶ 55. These articles described Kuklachev as the founder of the Moscow Cats Theatre; the programs and advertisements for the show did the same. P. Mem. Ex. I-2, Ex. I-4; P. Reply to Gelfman Ex. C, Ex H. In interviews on several television shows to promote his performances, Kuklachev related the history of how he had founded the Moscow Cats Theatre. *Id.* at ¶ 57.

Kuklachev provided the stage equipment and props, brought all technicians from his theater in Moscow except for the

lighting director, paid taxes for all performers and workers, and provided performers to replace himself in case of illness. Supp. Kuklachev Decl. at ¶ 6. Gelfman did not accompany the tour outside of New York City and did not spend time on the theater set. *Id*. at ¶ 7. Gelfman claims that Gelfman Inc. bore the financial risks and paid for travel and insurance. Gelfman Decl. at ¶ 8. Gelfman "Americanized" the performance by shortening it and removing aspects that might be less successful with American audiences than Russian ones. *Id*.

Final decisions on removing, inserting, or modifying parts of the show were made by Kuklachev. Supp. Kuklachev. Decl. at ¶ 8.

The 2005 and 2006 United States tours included approximately 250 shows. Gelfman Decl. at ¶ 14. At the end of the 2006 tour, Kuklachev returned to Russia. *Id*. at ¶ 15. According to Gelfman, Kuklachev asked to be paid more for each performance and wanted Gelfman Inc. to book more performances than had been scheduled. *Id*. Gelfman claims that when he refused to increase the pay, Kuklachev declined to return for a 2007 tour with Gelfman Inc. *Id*. Kuklachev disputes this claim, and states that at the beginning of 2007, when he was making preparations for the tour, Gelfman called to say that he was ill and that the tour would have to be postponed until September of 2007. Supp. Kuklachev Decl. at ¶ 10.

In 2005, the plaintiffs brought an extensive assortment of

scenic stage materials and props into the United States from
Russia, some of which were manufactured specifically for the
Moscow Cats Theatre. Compl. at ¶ 183. In late December 2006,
Gelfman asked Kuklachev to store the scenic materials in the
United States under Gelfman's supervision, in order to save the
money required to transport the materials. Id. at ¶ 186.
Defendants thereafter used some of plaintiffs' scenic materials
for their shows, in particular, a background scene portraying a
view of Paris out of a clown-artist's studio, which was developed
and ordered by Kuklachev in Moscow for use in his expected 2007
United States Tour. Id. at ¶¶ 167, 189.

*The 2007 Copycat Tour*

On January 4, 2007, a few days after plaintiffs left the
United States following their 2006 tour, Gelfman filed a
trademark application with the United States Patent and Trademark
Office, seeking to register the "Moscow Cats Theatre" trademark
in his own name.[7] Id. at ¶ 63. Defendants thereafter entered into
contracts to host or promote Moscow Cats Theatre performances
with defendant venues. Id. at ¶ 67. Defendants also entered into
contracts with or made other arrangements with defendant cast and
crew members Vladimir Krasnolozhkin, Vladimir Anisimov, Dmitry
Krassotkine, Yuri Potoski, Michael Zlotnikov, Andrey Yankovis,

---

[7]Application Serial No. 77075635, filed on January 4, 2007.

Stanislav Nemoy, and others to participate in these performances.
*Id.*

Plaintiffs own the domains moscowcatstheatre.ru and
catstheatre.ru, which have been in existence since 2003.[8] In
2005, Gelfman registered the domain name moscowcatstheatre.com
for purposes of promotion and advertisement and began to display
materials pertaining to plaintiffs' personas and plaintiffs'
Moscow Cats Theatre performances.[9] In early 2007, without
plaintiffs' authorization or knowledge, defendants began using
the domain to advertise the allegedly infringing performances.
*Id.* Defendants had also registered catstheatre.com,
catscircus.com, moscowcatscircus.com, moscowonbroadway.com, and
moscowbroadwayproductions.com.  Declaration of Michael Kessler at
¶ 11 ("Kessler Decl.").

For their performances, defendants conducted an advertising
campaign that included the terms "Moscow Cats Theatre" and
"Moscow Cats" in conjunction with plaintiffs' likenesses and
images and plaintiffs' Moscow Cats Theater promotional materials,
causing actual confusion among the members of the audience, who
thought that Kuklachev and his troupe were performing in
Gelfman's shows. Compl. at ¶ 69. Several media reviews of the

---

[8] *See* http://www.whois.com entry for moscowcatstheatre.ru and
catstheatre.ru.

[9] Compl. at ¶ 68. *See also* http://www.whois.net for registration
information and http://www.archive.org for archived images of earlier versions
of the website.

show indicate that there was confusion about whether Kuklachev
was involved in the 2007 and 2008 performances. Kessler Decl. at
¶ 15. Confused audience members contacted the Moscow Cats Theatre
in Moscow demanding their money back for performances that were
conducted by defendants. Compl. at ¶ 70. Kuklachev received a
letter from Natalya Goncharova, who said she had seen the Seattle
Reperatory Theater's email advertising the "World famous Moscow
Cat's Theatre" with a picture of Kuklachev and immediately
purchased tickets, expecting to see Kuklachev and his troupe
performing in the show. Letter from Natalya Goncharova to Seattle
Reparatory Theater, at 1 ("Goncharova Letter"). After the show,
Ms. Goncharova complained to the cast members about the absence
of Kuklachev, and was told to talk to Gelfman, who directed that
she be escorted from the hall. *Id.* She later requested a refund.
*Id.* at p. 2. Another cat enthusiast who had seen Kuklachev on
Russian television as a youth heard that the Moscow Cats Theatre
was coming to Boston and bought tickets, noting Kuklachev's
poster at the ticket location. Affidavit of Nina Mavrodi at ¶¶
3,4 ("Mavrodi Aff."). She went to the show at Hancock Hall,
expecting to see Kuklachev in the show. *Id.* at ¶ 6. She was
disappointed that Kuklachev was not in the show, felt deceived,
and was distressed because the show was boring and her
grandchildren were not impressed. *Id.* at ¶¶ 8,9.

Defendants used a poster showing an image of Dmitri

Kuklachev with a cat doing a "front-paw stand" on his hand[10] to
show priority of the use of the trademark when making their
application to the United States Patent and Trademark Office.
Compl. at ¶ 71. This poster advertised the 2007 Los Angeles and
San Francisco tours of the allegedly infringing show. *Id.* This
poster also contained the words "World's Only" in front of the
term "Moscow Cats Theatre." *Id.* at ¶ 72. Additional posters and
other performance-related materials bear portraits of Kuklachev
and other references to plaintiffs. *Id.* at ¶ 73. The defendants
also sold copies of promotional materials, including T-shirts,
key chains, and recordings of plaintiffs' performances, developed
by plaintiffs. *Id.* at ¶ 168. Plaintiffs offer an affidavit from
an audience member who attended a performance at the Tribeca
Performing Arts Center on January 13, 2008, and took photographs
of merchandise sold there, including merchandise containing
images of plaintiffs. P. Reply to Gelfman Ex. J.

Following performances, defendants and various theaters
hosting performances were contacted by audience members upset
with the absence of the Kuklachevs, who had been advertised as
performing. Compl. at ¶ 80. Nevertheless, venues continued to
schedule and sell tickets for the performances. *Id.*

The performances conducted by the Gelfmans are similar in

---

[10] Plaintiffs consider this to be one of their signature tricks.
Declaration of Dmitri Kuklachev at ¶ 20.

nature to the ones performed by plaintiffs, using similar promotional methods. *Id.* at ¶ 74. The Gelfmans' stage set up, show themes, devices, and tricks are in many cases identical to those used by plaintiffs. *Id.* at ¶ 75. Examples include: using birdfeeders at stage right and left for the cats to hide in during the show, cats riding electric cars and pushing carts with other animals in them, cats jumping from a long pole into a small pillow in a clown's hands, and cats on rockinghorses. *Id.* at ¶ 76, 77. One particularly elaborate sketch designed and used by the plaintiffs appears in the Gelfmans' shows: a clown lies down to sleep and turns off a light, at which point an animal comes on stage and turns the light back on, angering the clown, who smashes the lamp bulb. *Id.* at ¶ 77. The animal returns to the stage and appears to eat the glass fragments. When the animal leaves the stage, the audience sees a light bulb shining under its tail. *Id.*

*Gelfman's Account of the 2007 Tour*

Gelfman does not dispute the above but states that in early 2007, with shows booked and Kuklachev no longer willing to perform, Gelfman Inc. hired a new cast of performers and revised its advertisements and promotional materials to advertise an "all new show" and continued to sell merchandise from inventory left over from the 2005 and 2006 tours. Gelfman Aff. at ¶ 17. Gelfman

denies using plaintiffs' names and images on advertisements and
promotional materials, or in the moscowcatstheatre.com website.
*Id.* at ¶ 20. Gelfman acknowledges that venues and ticket vendors
may have used plaintiffs' names or images in connection with
advertisements of shows taken from internet searches without
consulting Gelfman Inc. *Id.* at ¶ 21.

Prior to the commencement of this lawsuit, Gelfman Inc. had
booked performances of the Moscow Cats Theatre production through
late 2009. *Id.* at ¶ 24. Gelfman states that a lead time of six
months is required in order to prepare a new performance run. *Id.*
at ¶ 25. Gelfman claims that he has no performances of the Moscow
Cats Theatre scheduled. *Id.* at ¶ 26. However, plaintiffs have
directed the Court to the website of the Kirkland Performance
Center, located in Kirkland, Washington, which currently lists a
performances of the Moscow Cats Theatre on February 21, 2009. P.
Reply to Gelfman Ex. G.[11] Accompanying the text is a photograph of
Kuklachev. *Id.*


*Plaintiffs Commence Legal Action*

Once they learned of the infringement, the Kuklachevs
attempted to stop Gelfmans' conduct through calls and written
requests to change the name of the allegedly infringing show and

---

[11]*See* http://www.kpcenter.org/cgi-bin/event.cgi?id=325 for the original
website copied in the exhibit. Last visited December 3, 2008.

to remove the Kuklachevs' sketches from the show. Supp. Kuklachev
Decl. at ¶ 12. Gelfman responded by proposing to reveal to the
Russian press the details of Kuklachev's compensation for the
2005 and 2006 tours and the fact that he printed programs in
Russia, which Gelfman alleged was a violation of Russian laws. *Id*
at ¶ 11. By letter dated May 31, 2007, attorneys for Kuklachev
informed counsel for the Gelfmans that Kuklachev possessed rights
in the Moscow Cats Theatre mark and that the Gelfmans' use of the
mark was an infringement. P. Reply to Gelfman Ex. E. Mark Gelfman
responded to Kuklachev's attorneys on June 22, 2007, stating that
Gelfman Inc. was the true owner of the mark and that Gelfman had
fired Kuklachev following a number of petty disputes during the
2006 tour. P. Reply to  Gelfman Ex. F.

At present, although both plaintiffs and defendant Gelfman
are seeking to obtain one, neither has a federal trademark
registration for the use of the Moscow Cats Theatre mark in the
United States. On January 4, 2007, Gelfman filed a federal
trademark application for the mark. Declaration of Jessica A.
Rose at ¶ 3 ("Rose Decl."). The United States Patent and
Trademark Office ("USPTO") approved the mark for publication on
August 8, 2007. *Id.* at ¶ 4. On August 31, 2007, Yuri Kuklachev
instituted proceedings before the Trademark Trial and Appeal
Board ("TTAB") of the USPTO, opposing the registration of the

mark.[12] Rose Decl. at ¶ 5. Kuklachev states he was informed by his attorneys that once the opposition proceedings got underway, Gelfman would cease his infringing activity. Supp. Kuklachev Decl. at ¶ 15. However, as the 2007 winter season drew near, plaintiffs realized that the Gelfmans' infringement was continuing. *Id.* at ¶ 16. Kuklachev thereupon secured counsel to send a cease-and-desist letter to the Tribeca Performing Arts center, demanding cessation of all infringing conduct. *Id.* On December 9, 2007, attorneys for plaintiffs sent a letter to Tribeca warning it of the alleged infringement. P. Reply to Tribeca Ex. A. In a letter dated December 13, 2007, attorneys for Gelfman Inc. sent a letter to plaintiffs warning them that their letter to Tribeca would be "deemed a tortious interference," and stating that Gelfman Inc. would vigorously pursue its rights and seek reimbursement of attorneys fees. P. Reply to Tribeca Ex. B. Tribeca responded to plaintiffs' letter in January of 2008, stating that it would not become involved in the legal dispute and would continue to honor its contract with the Gelfmans. *Id.*

During this same period, plaintiffs sought competent, affordable, Russian-speaking New York litigation attorneys admitted to practice in the federal courts, who could handle an

---

[12]On September 6, 2007, Dmitri Kuklachev instituted similar proceedings against Gelfman's application. *Id.* at ¶ 6. The TTAB suspended these opposition proceedings on July 21, 2008, pending the outcome of this litigation. *Id.* at ¶ 7. The Kuklachevs have also applied for registration of their common law rights in the "Moscow Cats Theater" trademark, which registration is pending. Compl. at ¶ 82.

intellectual property oriented case. Supp. Kuklachev Decl. at ¶
17.

Kuklachev states that plaintiffs did not contemplate making
a motion for a preliminary injunction in early 2008, because the
allegedly infringing shows were no longer running and plaintiffs
were unaware of any new performances scheduled. *Id.* at ¶ 17. Of
the defendant venues in this action, Kean was the last to host a
performance of the allegedly infringing show on January 20th,
2008. Gambini Decl. at ¶ 6. The complaint was filed on June 2,
2008. In the Fall of 2008, plaintiffs noticed advertisements for
new performances scheduled by Gelfman for the 2008-2009 season.
Supp. Kuklachev Decl. at ¶ 18. Shortly after noticing this new
development, plaintiffs filed their motion for a preliminary
injunction. *Id.*


*Facts Pertaining to Certain Defendant Venues*

The Wilshire Ebell Theatre, owned and operated by the Ebell
Operating Company ("Ebell"), is a venue located in Los Angeles,
California. Declaration of Philip R. Miller at ¶ 1. In 2006 and
2007, Ebell entered into three lease agreements with defendant
Gelfman Inc. for performances of the Moscow Cats Theatre. *Id.* at
¶ 2. The November 7, 2006 lease was for performances in November
and December 2006, and the December 14, 2006 lease was for
performances in April 2007, and the April 23, 2007 lease was for

performances in May 2007.[13] *Id.* at ¶ 3. Ebell has not entered into
any lease agreements for future performances of the Moscow Cats
Theatre. *Id.* at ¶ 5. Ebell has also submitted an affidavit
stating that it will not enter into any such lease agreements
until the ownership rights of the work are decided by a Court.
*Id.* at ¶ 6.

The Napa Valley Opera House ("NVOH") and Palace of Fine Arts
League ("PFA") are two California non-profit corporations.
Declaration of Larry Tsai at ¶ 3. Neither NVOH nor PFA produce
their own shows. *Id.* NVOH uses only local sources for
advertising, while PFA does no advertising at all. *Id.* at ¶ 5,
Declaration of Kevin O'Brien at ¶ 5.

Wilkins Theater at Kean University ("Kean") is a New Jersey
State entity. The last performance of the Moscow Cats Theatre
held at Kean was on January 20, 2008. Declaration of Lindsay
Gambini at ¶ 6. At that time, Kean was not aware of any dispute
regarding the performance, nor had it received a cease-and-desist
letter regarding the performance. *Id.* at ¶¶ 7, 8. Kean has not
scheduled any future performances of the Moscow Cats Theatre, nor
will Kean permit the show to be performed at its facilities under
any circumstance, with or without a performance agreement, until
the ownership of the show is determined by a Court. *Id.* at ¶ 10.

---

[13]Plaintiffs allege that the performances under the November 7, 2006
lease was genuine and that the performances under the December 14, 2006 and
April 23, 2007 leases were infringing.

Kean removed information regarding the Moscow Cats Theatre from its website approximately one week after the last performance in January 2008 and has no plans to publish that information again. *Id.* at ¶ 14.

The Gwinnett Center ("Gwinnett") is located in Duluth, Georgia, and is operated by the Gwinnett Convention and Visitors Bureau, Inc., a non-profit organization. There were two performances of the Moscow Cats Theatre at Gwinnett, on October 20th and 21st, 2007. Affidavit of Joseph L. Dennis at ¶ 3. There are no current contracts scheduling performances of the Moscow Cats Theatre at Gwinnett, and Gwinnett states in an affidavit that it will not schedule any future performances of any act purporting to be the Moscow Cats Theatre until the ownership of the work is settled. *Id.* at ¶¶ 4, 5. Gwinnett does not own or possess any material used to promote the Moscow Cats Theatre. Id. at ¶ 7.

The Seattle Repertory Theater ("SRT") is a non-profit organization located in Seattle, Washington. There were two performances of the Moscow Cats Theatre at SRT, on June 2nd and June 3rd, 2007. Affidavit of Rachel Robert at ¶ 4. There are no present or future performances of the Moscow Cats Theatre scheduled at the SRT. Id.

*Facts Pertaining to Online Ticket Vendors*[14]

Defendant Ticketmaster.com ("Ticketmaster") is an internet-based e-commerce site. Declaration of Michael Norton at ¶ 3 ("Norton Decl."). Ticketmaster provides ticket sales, ticket resale services, marketing, and distribution. *Id*. On August 17, 2006, Ticketmaster and Gelfman Inc. entered into a contract in which Ticketmaster agreed to sell tickets to Gelfman Inc.'s show for a fee. *Id*. at ¶ 4. Ticketmaster states that it and Gelfman represented and warranted to one another that each owned or controlled the rights granted or licensed to the other party in the agreement, and that entering into the performance of the agreement would not violate the rights of any third party. Norton Decl. Ex. A. Gelfman Inc. further represented to Ticketmaster that it had the sole and exclusive right to and authority to enter into the agreement. *Id*. Neither plaintiffs nor Gelfman Inc. informed Ticket master of the dispute between them. Norton Decl. at ¶ 5.

## DISCUSSION

### I. Jurisdiction

This Court has federal question jurisdiction over this the plaintiffs' Lanham Act and Copyright Act claims, pursuant to 15

---

[14]Onlineseats.com has not submitted any papers in connection with this motion. Therefore, only Ticketmaster.com will be discussed.

U.S.C. § 1121, 28 U.S.C. § 1338, and 28 U.S.C. § 1331 and
supplemental jurisdiction over the state law and common law
claims, pursuant to 28 U.S.C. § 1367.[15]

## II. Preliminary Injunction

Pursuant to Federal Rule of Civil Procedure 65(a), a
preliminary injunction is appropriate if the movant shows (a)
irreparable harm and (b) either (1) a likelihood of success on
the merits or (2) sufficiently serious questions going to the
merits to make them a fair ground for litigation and a balance of
hardships tipping decidedly toward the party requesting the
preliminary relief. *Gold v. Feinberg*, 101 F.3d 796, 800 (2d Cir.
1996) (citations omitted). The plaintiff must show a "real or
immediate threat that the plaintiff will be wronged again."
*Schroedel v. New York Univ. Med. Ctr.* 885 F.Supp. 594, 598
(S.D.N.Y. 1995). "[A] showing of probable irreparable harm is the
single most important prerequisite for the issuance of a
preliminary injunction." *Reuters, Ltd. v. United Press Int'l,
Inc.*, 903 F.2d 904, 907 (2d Cir. 1990).

Although the plaintiffs' complaint states sixteen causes of
action, plaintiffs limit their arguments in their motion for a

---

[15]Four defendants, the Napa Valley Opera House, the Palace of Fine Arts,
the Seattle Repertory Theater, and the Ebell Operating Company have made
motions to dismiss on grounds that the Court lacks personal jurisdiction over
them. Personal jurisdiction will be addressed upon hearing of the respective
motions to dismiss, since plaintiffs are not entitled to preliminary
injunctive relief against any of these defendants.

preliminary injunction to their Lanham Act and right of publicity claims.

## A. The Lanham Act

Under Section 43(a) of the Lanham Act,

"(1) Any person who, on or in connection with any...
services... uses in commerce any word, term, name, symbol,
or device, or any combination thereof, or any false
designation of origin... or false or misleading
representation of fact, which--
    (A) is likely to cause confusion, or to cause mistake,
    or to deceive as to the affiliation, connection, or
    association of such person with another person, or as
    to the origin, sponsorship, or approval of his or her
    goods, services, or commercial activities by another
    person, or
    (B) in commercial advertising or promotion,
    misrepresents the nature, characteristics, qualities,
    or geographic origin of his or her or another person's
    goods, services, or commercial activities,
shall be liable in a civil action by any person who believes
that he or she is or is likely to be damaged by such act.

15 U.S.C. § 1125(a). A claim of trademark infringement, whether

brought under 15 U.S.C. § 1114(1) (for infringement of a

registered mark) or 15 U.S.C. § 1125(a) (for infringement of

rights in a mark acquired by use), is analyzed under a two part

test: (1) "whether the plaintiff's mark is entitled to

protection," and (2) "whether defendant's use of the mark is

likely to cause consumers confusion as to the origin or

sponsorship of the defendant's goods." *Virgin Enters., Ltd. v.*

*Nawab*, 335 F.3d 141, 146 (2d Cir. 2003) (citing *Gruner + Jahr USA*

*Publ'g v. Meredith Corp.*, 991 F.2d 1072 (2d Cir. 1993); *Time,*

*Inc. v. Petersen Publ'g Co. L.L.C.*, 173 F.3d 113, 117 (2d Cir. 1999)). Demonstrating that there is a likelihood of confusion in a trademark case establishes both a likelihood of success on the merits and irreparable harm. *Strange Music, Inc. v. Strange Music, Inc.*, 326 F. Supp. 2d 481, 486 (S.D.N.Y. 2006).

## 1. Irreparable Harm

*a. Delay*

Defendants Ticketmaster and the Gelfmans argue that plaintiffs' delay of between fifteen and twenty months[16] in moving for a preliminary injunction demonstrates that there is no irreparable harm. Plaintiffs state that they learned of the alleged infringement in "early 2007." Compl. at ¶ 62. The Complaint was filed on June 2, 2008, and plaintiffs moved for a preliminary injunction on October 22, 2008.

"Significant delay in applying for injunctive relief in a trademark case... may justify denial of a preliminary injunction for trademark infringement." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (2d Cir. 1985). "A district court should generally consider delay in assessing irreparable harm." *Tom Doherty Assocs., Inc. v. Saban Entm't, Inc.*, 60 F.3d 27, 39 (2d Cir. 1995) (citations omitted). "Lack of diligence... may... preclude

---

[16]The defendants differ in their calculations of the amount of delay.

the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm." *Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (2d Cir. 1985).

Delay generally destroys the presumption of irreparable harm that follows a showing of likelihood of confusion in a trademark case. *See Tough Traveler, Ltd. v. Outbound Prods.*, 60 F.3d 964, 968 (2d Cir. 1995). However, the presumption remains in cases where the plaintiff was unaware of its rights or was actively pursuing its rights. *See Tom Doherty Assocs.*, 60 F.3d at 39 (four month delay not unreasonable because plaintiff was verifying that there was actual infringement); *Fisher-Price Inc. v. Well-Made Toy Mfg. Corp.*, 25 F.3d 119, 125 (2d Cir. 1994) (delay not unreasonable where plaintiff searched for five months for defendants' infringing products and sought injunction less than two weeks after finding the product); *King v. Innovation Books*, 976 F.2d 824, 831 (2d Cir. 1992) (author's eight month delay in seeking injunction against a movie studio regarding dispute over movie credits excusable where the author contacted the studio and repeatedly objected to the credits); *Clifford Ross Co. v. Nelvana, Ltd.*, 710 F. Supp. 517, 521 (S.D.N.Y. 1989) (seven month delay in filing not unreasonable because plaintiff was not aware of the true extent of the infringement and the intervening period involved constructive effort to resolve the dispute without litigation); *MGM-Pathe Communications Co. v. Pink Panther Patrol*,

774 F. Supp. 869, 873 (S.D.N.Y. 1991) (seven month delay not unreasonable where defendant political group had threatened to generate bad publicity if plaintiff sought an injunction). The Second Circuit has stated that "the cases in which we have found that a delay rebutted the presumption of irreparable harm are trademark and copyright cases in which the fair inference was drawn that the owner of the mark or right had concluded that there was no infringement but later brought an action because of the strength of the commercial competition." *King*, 976 F.2d at 831. In all events, avoidance of consumer confusion remains a paramount goal, even if a plaintiff delays in filing suit. *Profitness Physical Therapy Ctr. v. Pro-Fit Orthopedic & Sports Physical Therapy P.C.*, 314 F.3d 62, 68 (2d Cir. 2002).

Here, the facts are that plaintiffs have diligently pursued their rights, to the extent practical, given that they are foreign nationals who do not speak English and are regularly on tour, making it difficult for them to determine the extent of the harm as it occurred.

Kuklachev was not in the United States when he learned of the infringement, does not speak English, and is regularly on tour. As a result, he was not aware of scale of the Gelfmans' allegedly infringing activity, and it was difficult for him to investigate it. Supp. Kuklachev Decl. at ¶ 12. Once plaintiffs learned the extent of the infringement by the Gelfmans, they

hired attorneys to send a cease-and-desist letter to the
Gelfmans' counsel in May of 2007. The delay between the beginning
of 2007 and the time the letter was sent is explained by the need
to investigate the nature of the infringement and to explore what
legal recourse was possible. In June of 2007, Gelfman responded
with a letter denying the plaintiffs' claims. At that time no
performances of the allegedly infringing show were taking place.
In August of 2007, the Kuklachev's appealed the trademark
application granted to the Gelfmans. In the fall of 2007, the
plaintiffs contacted New York based attorneys to send another
cease-and-desist letter, to which they received a reply in
January of 2008. At that time, there were no future performances
scheduled. Plaintiffs next turned their attention to securing
counsel in the United States who could represent them in an
action against the defendants, which they commenced in June of
2008. When further infringement was threatened in the fall of
2008, plaintiffs took immediate steps to file a motion for
preliminary injunctive relief.

The Gelfmans cannot claim to have been uninformed about the
plaintiffs' claims against them or the possibility of legal
action. The Gelfmans and the plaintiffs exchanged letters
regarding the alleged infringement in May of 2007. The delay in
filing the suit is explained by the difficulty of locating
suitable attorneys in the United States and also by the absence

of the immediate threat of harm, given that there were no shows
scheduled after January of 2008. Similarly, the delay in seeking
the preliminary injunction was not unreasonable, given that the
there was no prospect of immediate harm since no shows were being
performed by the Gelfmans. The plaintiffs took action as soon as
it became clear that new shows were being scheduled. The delay in
this case is excusable as to plaintiffs' action against the
Gelfmans.

The cases cited by defendants for the proposition that
plaintiffs' delay requires denial of the motion for preliminary
injunction are distinguishable. In *Citybank*, an injunction was
denied where Citybank delayed nine months after learning that
competition intended to move into its home territory, and ten
weeks after the competing branch was opened. 756 F.2d at 277. The
court stressed Citybank's significant resources as a major bank
and also pointed to other similar behavior on the part of
defendants to which Citybank did not object. *Id.* In *Tough
Traveler,* 60 F.3d 964, the Court denied a preliminary injunction
where a seller of child carrier products delayed a year after
learning about the infringing product. Although an initial delay
of several months might have been understandable given that the
'selling season' of the product lasted from January to June,
plaintiffs inexplicably failed to take action during the course
of an entire selling season that followed. In *Gidatex, S.r.L. v.*

*Campaniello Imports, Ltd.*, 13 F. Supp. 2d 417 (S.D.N.Y. 1998),
plaintiff's two year delay in moving for a preliminary injunction
was not explained by plaintiff's prosecution of other aspects of
the litigation, and the motion appeared in fact to be motivated
by a desire to suppress defendant as a potential competitor. In
*Bear U.S.A. v. A.J. Sheepskin & Leather Outerwear*, 909 F. Supp.
896 (S.D.N.Y. 1995), the court denied an injunction to a clothing
maker who had known that defendant was selling infringing shirts
and jeans for four months and yet had not taken any action.
Plaintiffs did not rest on their rights against the Gelfmans or
fail to give reasons for their delay, rendering these cases
inapposite.

Ticketmaster is differently situated, as it was unaware of
the allegations of infringement until June 2, 2008, when
plaintiffs filed the complaint. Declaration of Michael Norton at
¶ 5. Plaintiffs did not contact Ticketmaster or send it a cease-
and-desist letter, as they did in the case of other defendants.
Because plaintiffs failed to take advantage of the opportunity to
appraise Ticketmaster of the impending action and enable it to
take steps to avoid harm, plaintiffs' delay in moving for a
preliminary injunction was not reasonable as to Ticketmaster. The
motion is denied as to Ticketmaster.[17]

---

[17]Defendant Onlineseats.com appears to have been similarly situated to
Ticketmaster in this regard. Although Onlineseats has not submitted papers in
connection with this motion, plaintiffs have failed to make the requisite
showing that their delay was excusable as to this defendant. The injunction is

*b. Mootness*

All of the defendant venues assert that because they have no plans to host future performances of the Moscow Cats Theatre,[18] the application for a preliminary injunction is moot as to them.[19] "A suit for injunctive relief is moot when the offending conduct ceases and the court finds that there is no reasonable expectation that it will resume." *American Exp. Travel Related Services Co., Inc. v. MasterCard Intern. Inc.*, 776 F.Supp. 787, 790 (S.D.N.Y. 1991). A plaintiff cannot show irreparable harm without demonstrating that absent a preliminary injunction it will suffer "an injury that is neither remote nor speculative, but actual and imminent," and one that cannot be redressed through a monetary award. *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60, 66 (2d Cir. 2007). A defendant's expressed intention to cease the offending conduct is not sufficient to eliminate the possibility of irreparable harm. *Twentieth Century Fox Film Corp. v. Marvel Enters.*, 155 F.Supp.

denied as to Onlineseats.

[18]In addition to stating that there are no future plans to host performances of the Moscow Cats Theatre, Ebell, Wilkins, and Kean have submitted sworn affidavits stating that they will not host future performances until the ownership of the production is determined. NVOH and PFA offered to submit such an affidavit, but plaintiffs did not respond. Declaration of Theo J. Robins at ¶ 5.

[19]The venues make other arguments regarding the failure of plaintiffs to show a likelihood of success on the merits and the delay in bringing this motion. Because there is no showing of irreparable harm, there is no need to discuss these other claims. In addition, NVOH and PFA renew their argument, first made in their motion to dismiss, that the Court lacks jurisdiction over them. I will address this issue upon hearing of the motion to dismiss.

2d 1, 49 (S.D.N.Y. 2001). Absent the provision of a consent injunction or other enforceable assurance that the alleged infringement will not be repeated, courts are reluctant to deny injunctions. *Id.* at 48-49; *Upjohn Co. v. American Home Products Corp.*, 598 F. Supp. 550, 555 (S.D.N.Y. 1984).

In the case of all the above mentioned theaters, I find that there is no reasonable expectation that the offending conduct will resume. These theaters did not create the allegedly infringing show, nor do they have a vested interest in having the show performed at their venues again. Plaintiffs have submitted no evidence that the theaters will host future performances of the allegedly infringing show, nor have they shown that the theaters do include or will include any information about those performances in their websites or promotional materials, nor that the theaters have made or will make any false statements regarding the origin of the allegedly infringing shows, all of which are actions that plaintiffs seek to enjoin. Plaintiffs have failed to establish the likelihood of irreparable harm as to Ebell, NVOH, PFA, Kean, Gwinnett, and Seattle. The motion for a preliminary injunction against these defendants is denied.

## 2. Likelihood of Success on the Merits

*a. Ownership*

In a trademark case, as a threshold matter, plaintiffs must

establish their ownership of, or superior right to use, the mark in question. *See P. Daussa Corp. v. Sutton Cosmetics (P.R.) Inc.*, 462 F.2d 134, 136 (2d Cir. 1972); *Pan Am. World Airways, Inc. v. Flight 001, Inc.*, 2007 U.S. Dist. LEXIS 51012, at *7-11 (S.D.N.Y. 2007). Defendants Ticketmaster and the Gelfmans argue that plaintiffs do not own the Moscow Cats Theatre mark, and therefore have no ground to assert a claim of infringement.

"Two tests have been established for determining who owns an entertainment group's service mark." *Cheng v. Thea Dispeker Inc.*, 35 U.S.P.Q.2D (BNA) 1493, at *11 (S.D.N.Y. 1995). The first looks to who controls the quality of the services which have been marketed under the mark in question, while the second looks to whether the mark is personal to a particular set of performers. *Id.* With regards to the second test, "[t]he issue to be resolved is whether the mark signifies personalities, or style and quality regardless of personalities." Thomas McCarthy, McCarthy on Trademarks and Unfair Competition, § 1614[4], at 16-56 (3rd ed. 1994).

Plaintiffs have offered evidence sufficient to establish a likelihood of their ownership under both tests. The contract with the Gelfmans expressly provided that Kuklachev would have "sole and exclusive control of the presentation and control of the show." Gelfman Aff. Ex. A. at 5. Gelfman claims that he cut out some parts of the show in order to make it more appealing to

American audiences. Gelfman Decl. at ¶ 8. Nevertheless, the
overall quality of the show from one performance to another
remained in the hands of Kuklachev. All of the cast and crew
members, including the cats, were brought by Kuklachev from his
theater in Moscow. Supp. Kuklachev Decl. at ¶ 6. If Kuklachev was
unable to perform in any given performance, he would seek his own
replacement. *Id*. Kuklachev states, and Gelfman does not dispute,
that Gelfman never hired any performers for the tour. *Id*. at ¶ 8.
Under the contract, Gelfman did not have a right to engage any
other artist to perform in the show. Gelfman Aff. Ex. A, at 2.
Furthermore, Gelfman himself acknowledged that Kuklachv was the
owner of the Moscow Cats Theatre, when he wired payments to
Kuklachv's "Moscow Cats Theatre" account at the Bank of Moscow.
P. Reply to Gelfman Ex. A.

Regarding the second test, plaintiffs have offered ample
evidence creating a strong likelihood of success in establishing
that the name Moscow Cats Theatre is personal to them. The show
programs, media reviews, and advertisements list Kuklachev as the
founder of the Moscow Cats Theatre, describing him as a
specialist in working with cats who has managed to accomplish the
singular tax of coaxing them to perform on stage. P. Mem. Ex. I-
2, Ex. I-4; P. Reply to Gelfman Ex. C, Ex H. It is likely, as
customers attested, that anyone who had read a review or seen a
prior performance would expect that Kuklachev would be a part of

the Moscow Cats Theatre production. Plaintiffs have submitted
evidence that audience members attended the allegedly infringing
performances specifically to see Kuklachev perform, and were
angry and disappointed when they learned that he was not part of
the production. *See* Goncharova letter, Mavrodi Aff. The contract
between the parties referred to the show as a product of "his
theater," referring to Kuklachev. Gelfman Aff. Ex. A at 2.

Even under the test for ownership of a non-entertainment
trademark, the plaintiffs have established a likelihood that they
own the Moscow Cats Theatre mark. "The user who first
appropriates the mark obtains an enforceable right to exclude
others from using it, as long as the initial appropriation and
use are accompanied by an intention to continue exploiting the
mark commercially." *La Societe Anonyme des Parfums v. Patou*, 495
F.2d 1265, 1271 (2d Cir. 1974). The Gelfmans state that they were
the first to appropriate the mark in 2005 with the beginning of
the plaintiffs' 2005 tour. However, articles reviewing
performances and listings of performances of Kuklachev's show in
2000 and 2001 list the name as "Moscow Cat Theatre." P. Reply to
Gelfman Ex. H. Defendants argue that this is not the same name,
and that ownership is not established. However, the absence of
the 's' is not sufficient to overcome plaintiffs' showing of
ownership. The Gelfmans further argue that even if plaintiffs did
use the mark in 2000 and 2001, they discontinued using it in the

United States and therefore lost rights to it, citing the Lanham Act, which states that nonuse of a mark "for 3 consecutive years shall be prima facie evidence of abandonment." 15 U.S.C. § 1127. This is a rebuttable presumption. *Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir. 1980). *See also ITC Ltd. v. Punchgini, Inc.*, 482 F.3d 135, 148 (2d Cir. 2007) (burden shifts to the one seeking to establish ownership to show that it did intend to resume use of the mark). Here, there was no abandonment. "[T]o overcome a presumption of abandonment after a sufficiently long period of non-use, a defendant need show only an intention to resume use 'within the reasonably foreseeable future.'" *Empresa Cubana del Tabaco v. Culbro Corp.*, 399 F.3d 462, 468 n.2 (2d Cir. 2005). Plaintiffs did not tour in the United States between 2002 and 2005. Plaintiffs clearly intended to resume use of the mark, as they did in 2005.

Gelfman's representations regarding his ownership and prior use of the mark are not persuasive. Gelfman stated in his trademark application that he first used the Moscow Cats Theatre mark in commerce in 1990, and described the use as being in conjunction with "production of Cat Shows and Performance in Shows by Cats." Rose Decl. Ex. B. In conjunction with his application, in order to show prior use in interstate commerce, he submitted photographs of plaintiffs with their cats and media reviews of the 2005 and 2006 tours. In his affidavit, Gelfman

states that during the summer of 2005, he "decided to call the
new [Gelfman Inc.] production 'Moscow Cats Theatre.'" Gelfman
Aff. at ¶ 6. He further states that he "considered calling the
production 'Broadway Cats Theatre,' but decided it was too
similar to the famous 'Cats' musical." *Id*. Gelfman's
representation to the Trademark office that he has used the
Moscow Cats Theatre mark in conjunction with cat shows since 1990
is not consistent with his affidavit, which states that he first
considered a different name in conjunction with the 2005 series
of cat performances and then settled on the Moscow Cats Theatre
mark.

### b. Distinctiveness

The "Moscow Cats Theatre" mark is not registered. For an
unregistered mark to be protectable under § 43(a), the "mark must
be sufficiently 'distinctive' to distinguish the registrant's
goods from those of others." *Louis Vuitton Malletier v. Dooney &
Bourke, Inc.*, 454 F.3d 108, 116 (2d Cir. 2006) (internal
quotations omitted). Marks are classified in categories of
increasing distinctiveness: "(1) generic; (2) descriptive; (3)
suggestive; and (4) arbitrary or fanciful." *Abercrombie & Fitch
Co. v. Hunting World, Inc.*, 537 F.2d 4, 9 (2d Cir. 1976); *see
also Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d
1033, 1039 (2d Cir. 1992). "The latter three categories of marks,

because their intrinsic nature serves to identify a particular source of a product, are deemed inherently distinctive and are entitled to protection." *Two Pesos v. Taco Cabana*, 505 U.S. 763, 768; 112 S. Ct. 2753; 120 L. Ed. 2d 615 (1992); *Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1070 (2d Cir. 1995). Generic marks are not protectable. *Two Pesos*, 505 U.S. at 768.

Marks that are merely descriptive of a product may "become distinctive;" this "acquired distinctiveness" is also referred to as "secondary meaning." *Id.* at 769. A plaintiff establishes secondary meaning by showing "that in the minds of the public, the primary significance of the mark is to identify the source of the product rather than the product itself." *Yurman Design, Inc. v. PAJ, Inc.*, 262 F.3d 101, 115 (2d Cir. 2001) (quotation marks omitted). "A trademark acquires secondary meaning when the name and the business have become synonymous in the mind of the public, submerging the primary meaning of the term in favor of its meaning as a word identifying that business." *Cadbury Beverages, Inc. v. Cott Corp.*, 73 F.3d 474, 479 n.3 (2d Cir. 1996) (quotation marks omitted); *see also Genesee Brewing Co., Inc. v. Stroh Brewing Co.*, 124 F.3d 137, 143 n.4 (2d Cir. 1997) (noting that secondary meaning exists where "the public is moved in any degree to buy an article because of its source"). Factors that have long been considered relevant to determining the existence of secondary meaning include advertising expenditures,

consumer studies linking the mark to a source, unsolicited media
coverage, sales success, attempts to plagiarize the mark and the
length and exclusivity of the mark's use. *ITC Ltd. v. Punchgini,
Inc.*, 518 F.3d 159, 162 (2d Cir. 2008) (citation omitted). An
additional factor to be considered is whether potential customers
of defendants' business would associate the mark with plaintiffs.
*Id.* at 163.

Because there is no registered mark, plaintiffs must
establish that the mark is distinctive and entitled to
protection. The phrase "Moscow Cats Theatre" bears a clear
relation to the product it describes, and therefore is not
arbitrary, fanciful, or suggestive.[20] Instead, it has acquired
distinctiveness through secondary meaning. Several hallmarks of
secondary meaning are present. Customers attending Gelfman's
allegedly infringing shows purchased tickets due to their
association of the name Moscow Cats Theatre with Kuklachev.[21]

---

[20]Plaintiffs maintain that the mark is suggestive. They state that the
combination of the terms "Moscow," "cats" and "theatre" is not an obvious one
in the context of an animal circus. Furthermore, they state that the
combination of cats, generally perceived as almost impossible to train, and
theater, is unusual and fanciful. It is true that the concept of theatrical
cats is unexpected. However, a person hearing the term "Moscow cats theatre"
would know that the thing described was a theatrical performance by Russians
or involving Russian cats, which is an apt description of what is the case. A
name that describes a novel commodity does not thereby become suggestive.

[21]Letter from Natalya Goncharova to Director of Seattle Repertory
Theater (stating that the author purchased tickets to the Moscow Cats Theatre
expecting to see Kuklachev perform, and expressing disappointment that her
family "did not see the real Moscow Cats Theatre, but a sad imitation of it"
(referring to Gelfman's show)), Injunction Ex. I-9; Affidavit of Nina Mavrodi
(stating that she bought tickets to the show because she had always associated
Kuklachev with the Moscow Cats Theatre, and expressing disappointment that he
was not associated with the show that she saw (referring to Gelfman's show)).

Media coverage of the show during the 2005 and 2006 tours emphasized that Kuklachev was the founder of the Moscow Cats Theatre.[22] Plaintiffs have submitted evidence that their performances were highly successful.[23] Defendants recognized the success of the mark and determined that it was desirable to use it for their own shows. Taken together, these factors are sufficient to establish plaintiffs' likelihood of success with their claim that the Moscow Cats Theatre mark has acquired a secondary meaning.

c. *Likelihood of Confusion*

Once it is established that a mark is entitled to protection, it must be assessed whether there is a likelihood of confusion between the marks at issue. "The likelihood-of-confusion inquiry turns on whether numerous

---

[22]The following are a sampling of the numerous media articles submitted by plaintiffs that connect Yuri Kuklachev directly with the Moscow Cats Theatre name: (1) *Feline Acrobats are the Cats Meow*, CBS News, August 19, 2005 ("Yuri Kuklachev, founder of the world famous Moscow Cats Theatre"), Kessler Decl. Ex 2; (2) *Who Says You Can't Teach a Cat New Tricks?*, New York Times, September 17, 2005, p. A1 ("Yuri Kuklachev's Moscow Cats Theatre has performed all over the world."), Kessler Decl. Ex. 5; (3) *With Moscow Cats Theatre, the furry will fly*, Joan Anderman, Boston Globe, January 22, 2006 ("Kuklachev is the 56-year-old founder and (human) star of the Moscow Cats Theatre"), Kessler Decl. Ex. 5; (4) *The Moscow Cats Theatre brings som tom foolery to Tribeca*, TimeOut New York, September 15-21, 2005 ("Yuri Kuklachev brings the nimble felines of his Moscow Cats Theatre to NYC"), Kessler Decl. Ex. 5.

[23]*Cat Theatre a Feline Shrine*, Vanora Bennett, Chicago Sun-Times, Section 2 p. 36 ("the stars of Moscow's Cat Theatre take the stage for one of their many sold-out winter shows"); *Feline Acrobats are the Cats Meow*, CBS News, August 19, 2005 ("Because of [the show's] popularity, the theater has extended the show's run"); Nemoy Aff. at ¶ 13 ("Every performance of Kuklachev's Moscow Cats Theatre was a huge success.")

ordinary prudent purchasers are likely to be misled or confused
as to the source of the product in question because of the
entrance in the marketplace of defendant's mark." *Playtex Prods.*
*v. Georgia-Pacific Corp.*, 390 F.3d 158, 161 (2d Cir. 2004)
(quotations omitted). In considering the likelihood of confusion,
district courts generally apply eight nonexclusive factors, known
as the *Polaroid* factors:

> (1) the strength of the plaintiff's mark; (2) the similarity
> of plaintiff's and defendant's marks; (3) the competitive
> proximity of their products; (4) the likelihood that
> plaintiff will "bridge the gap" and offer a product like
> defendant's; (5) actual confusion between products; (6)
> defendant's good faith; (7) the quality of defendant's
> product as compared to plaintiff's; and (8) the
> sophistication of the purchasers.

*Streetwise Maps, Inc. v. VanDam, Inc.*, 159 F.3d 739, 742-43 (2d
Cir.1998) (citing *Polaroid Corp. v. Polarad Elecs. Corp.*, 287
F.2d 492, 495 (2d Cir.1961)). Furthermore, "the public's belief
that the mark's owner sponsored or otherwise approved the use of
the trademark satisfies the confusion requirement." *Star Indus.*
*v. Bacardi & Co.*, 412 F.3d 373, 384 (2d Cir. 2005). Each of these
elements will be discussed in turn.

The strength of a mark is a measure of a mark's
distinctiveness. *Omicron Capital, LLC v. Omicron Capital, LLC*,
433 F.Supp.2d 382, 389 (S.D.N.Y. 2006). As discussed above,
plaintiffs' mark is distinctive enough to merit protection. The
marks at issue are virtually identical, as the Gelfmans and the

plaintiffs both lay claim to the Moscow Cats Theatre mark. The
allegedly infringing shows are in direct competition with
plaintiffs' shows, since they are performed in the same theaters
in front of the same audiences.[24] Audience members have reported
actual confusion between the shows. Audience members attending
the Gelfmans' show believed that they were purchasing tickets to
a show involving Kuklachev. Plaintiffs have submitted letters,
affidavits, and printouts of theater review comment pages
submitted by audience members indicating that the quality of the
Gelfmans' show was low, which plaintiffs claim has had and will
continue to have a negative effect on plaintiffs' reputation.

Plaintiffs' allegations of bad faith focus primarily on the
Gelfmans, who they claim intentionally adopted all of the
attributes of plaintiffs' show in order to profit by association
with the Kuklachev reputation. The Gelfmans respond that it was
they that developed the Moscow Cats Theatre name. However, they
do not explain the extreme degree of similarity between the
shows. Plaintiffs have offered no evidence regarding bad faith on
the part of any of the venues or ticket vendors.

Audience members attending the allegedly infringing show had
no reason to suspect that there would be two separate shows
advertizing under the same name both involving cats doing tricks.
Audience members who know of Kuklachev's reputation for cat

---

[24]For example, the Tribeca theater hosted many performances in the 2005
tour and again performances for the allegedly infringing 2007 tour.

theater or who had seen performances of the show in 2005 and 2006 had every reason to assume that the Gelfmans' show was a continuation of the 2006 tour, starring the same performers and under the same creative control.

Plaintiffs have shown a likelihood of confusion according to a number of the *Polaroid* factors. In addition, under the Lanham Act, the "public's belief that the mark's owner sponsored or otherwise approved the use of the trademark satisfies the confusion requirement." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 584 (2d Cir. 1990) (citation omitted). Plaintiffs have offered evidence to show that audience members did believe that the allegedly infringing shows were sponsored or approved by Kuklachev. *See* Compl. at ¶ 70.

When a plaintiff shows a likelihood of confusion in a trademark case, that showing establishes both likelihood of success on the merits and irreparable harm. *Strange Music,* 326 F.Supp.2d at 486. In addition, the loss of customer goodwill constitutes an irreparable injury. *Johnson Controls, Inc. v. A.P.T. Critical Systems, Inc.*, 323 F.Supp.2d 525, 532 (S.D.N.Y. 2004). As the Second Circuit has explained, it is "very difficult to calculate monetary damages that would successfully redress the loss of a relationship with a client that would produce an indeterminate amount of business in years to come." *Ticor Title Ins. Co. v. Cohen*, 173 F.3d 63, 69-70 (2d Cir. 1999); *see also*

*Velo-Bind, Inc. v. Scheck*, 485 F.Supp. 102, 109 (S.D.N.Y. 1979) ("[w]hat is at stake here is plaintiff's good will built up over the years, which is not, contrary to defendant's assertion, monetarily ascertainable.").

Plaintiffs have established that, if the injunction does not issue, it is likely that their reputation will be harmed by the alleged infringement. Supp. Kuklachev Decl. at ¶ 19. Plaintiffs have submitted evidence of upcoming performances of Gelfmans' show[25] and evidence of customer dissatisfaction with the quality of past performances. If the Gelfmans are permitted to continue to produce the allegedly infringing performances, to claim ownership of the Moscow Cats Theatre mark on their website, and to represent that they are the owners of the mark, plaintiffs will in all likelihood suffer further loss of reputation and good will. The motion for a preliminary injunction as against Gelfman, Gelfman Inc., and Yanis Gelfman is granted with respects to the injunction requests that pertain to trademark.[26]

## III. Defendant Crew Members

---

[25]In addition to the Kirkland Theater site, as of December 2, 2008, at least three additional venues were selling tickets for performances of the Moscow Cats Theatre in 2009: the Chandler Center For The Arts in Arizona, The Maryland Hall for the Creative Arts, and the Haugh Performing Arts Center at Citrus College in California.

[26]Because I grant the motion on the basic trademark infringement claim, it is not necessary to consider the false advertizing, false designation of origin, dilution, and right of privacy claims.

Defendants Potoski, Zlotnikov, Yankovis, and Krassotkine[27] have not submitted papers in connection with this motion. Plaintiffs' complaint gives the following information about these defendants: Potoski is a director of the Gelfman's show, Zlotnikov is another director, about Yankovis the complaint is silent, and Krassotkine was listed as a press representative for the show.[28] Plaintiffs have not referred to any of the remaining defendants in their papers. Plaintiffs have not established a likelihood of success on the merits based on the only claims on which they seek preliminary injunctive relief against defendant crew members. Plaintiffs do not allege that these defendants individually made use of the Moscow Cats Theatre mark or that they contributed to any advertising for the show claiming to be connected to Kuklachev's work. None of these defendants were performers in the show, and therefore the plaintiffs' claims that their trade dress was infringed does not apply to them.

## IV. A Hearing is Not Required

A hearing is not required. *Maryland Cas. Co. v. Realty Advisory Bd. on Labor Relations*, 107 F.3d 979, 984 (2d Cir. 1997). No material facts are in dispute with respect to

---

[27]Krasnolozhkin and Anisimov have not yet been served.

[28]Krassotkine is no longer listed as press representative on the website.

plaintiffs' Lanham Act claims. *Charette v. Town of Oyster Bay*, 159 F.3d 749, 755 (2d Cir. 1998). The parties' conflicting stories regarding the reasons why Kuklachev did not return for the 2007 tour have bearing on whether the contract was broken and, if so, who broke it. They are not, however, relevant for the purposes of this motion. The phrase "Moscow Cats Theatre" was nowhere mentioned in the contract, nor did the contract make any statement regarding control of the title of the show. Resolution of the conflicting accounts regarding that dispute is not necessary in order to decide this motion.

## V. Scope of the Injunction

In addition to seeking to restrain defendants from using the Moscow Cats Theatre mark in various ways, plaintiffs also seek an order impounding certain tangible property that they claim belongs to them in the Gelfmans' possession. The property is not identified in plaintiffs' papers.

In their complaint, plaintiffs have made a claim for conversion. However, in their motion for a preliminary injunction, plaintiffs have restricted their arguments to the trademark and right of publicity claims. Although I have found that plaintiffs have shown a likelihood of success on the merits and irreparable harm with respect to these claims as against the Gelfmans, those findings bear no relation to the claim of

conversion, upon which an impoundment order would be based.
Plaintiffs have failed to identify with any specificity the
materials they claim to own. They have presented no legal
arguments respecting their ownership of said materials.
Therefore, their application for an injunction impounding
tangible property belonging to them is denied, without prejudice
to a later application for a preliminary injunction that
addresses the conversion claim directly.

### CONCLUSION

For the reasons stated herein, the motion for a preliminary
injunction as against Mark Gelfman, Gelfman International
Enterprises, and Yanis Gelfman is granted, to the extent
described in the accompanying order. The motion as against all
other defendants is denied. The Clerk is directed to transmit a
copy of the within to all parties and the assigned Magistrate
Judge.

SO ORDERED.

Dated:    Brooklyn, New York
          December 22 , 2008

                         s/Hon. Charles P. Sifton
           By _____
                         United States District Judge