UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Yuri Kuklachev, Dmitri Kuklachev,

                    Plaintiffs,

                                            08-CV-2214(CPS)(VVP)

        - against -

Mark Gelfman, Gelfman International          MEMORANDUM
Enterprises, Inc., Yanis Gelfman,           OPINION
Tribeca Performing Arts Center,             AND ORDER
Ticketmaster.com, Palace of Fine Arts,
Wilkins Theater at Kean University,
Onlineseats.com, John Hancock Hall,
Gwinnett Center, Napa Valley Opera
House, LA's Wilshire Ebell's Theater,
Seattle Repertory Theater, Dmitry
Krassotkine, Yuri Potoski, Michael
Zlotnikov, Andrew Yankovis, Stanislav
Nemoy, Vladimir Krasnolozhkin, and
Vladimir Anisimov,

                    Defendants.

------------------------------------X
SIFTON, Senior Judge

        Yuri Kuklachev and Dmitri Kuklachev ("plaintiffs") commenced

this action against defendants Mark Gelfman ("Gelfman"), Gelfman

International Enterprises, Inc. ("Gelfman Inc."), Yanis Gelfman,

Tribeca Performing Arts Center, Ticketmaster.com, Palace of Fine

Arts, Wilkins Theater at Kean University, Onlineseats.com,

Tillinger's Concierge, Inc., Gwinnett Center, Napa Valley Opera

House, The Ebell Operating Company, Seattle Repertory Theater,

Yuri Potoski, Michael Zlotnikov, Andrey Yankovis, Stanislav

Nemoy, Vladimir Krasnolozhkin, Vladimir Anisimov, Dmitry

Krassotkine, other as yet unidentified persons and companies, and

the State of New Jersey, on June 2, 2008. Plaintiffs make the following claims in their complaint against each of the defendants: (1) federal trademark infringement under the Lanham Act, 15 U.S.C. § 1114; (2) false representation under the Lanham Act, 15 U.S.C. § 1125(a); (3) unfair competition and false designation under the Lanham Act, 15 U.S.C. § 1125(a); (4) trademark dilution under the Lanham Act, 15 U.S.C. § 1125(c); (5)cybersquatting in violation of the Lanham Act, 15 U.S.C. § 1125(d); (6) violation of privacy and publicity rights under the New York Civil Rights Law, Article 5, § 50 and § 51, N.Y. CLS Civ. R. § 50, 51; (7) injury to business reputation and trademark dilution under N.Y. GBL § 360-L; (8) unfair competition and false advertizing under the New York Unfair Trade Practices Law, GBL § 349-50 and New York City Administrative Code § 20-700, § 20-701; (9) unfair competition under New York common law; (10) unjust enrichment under New York common law; (11) copyright infringement; (12) trade dress infringement under the Lanham Act, 15 U.S.C. § 1125(a); (13) fraud; (14) conversion; (15) fraud in trademark application;[1] and (16) prima facie tort.

Now before the court is a motion filed on behalf of Gelfman Inc., Mark Gelfman ("Gelfman"), and Yanis Gelfman (the "Gelfmans" or "defendants")  to dismiss the entire complaint pursuant to Fed.R.Civ.Pro. Rule 12(b)(6) for failure to state a claim upon

---

[1]Alleged against Mark Gelfman only.

which relief can be granted, or, in the alternative, pursuant to Fed.R.Civ.Pro 12(e), directing the plaintiffs to file a more definite statement. With respect to Claim XIII for fraud, defendants move to dismiss pursuant to Rule 9(b). Additionally, defendants move to dismiss pursuant to Rule 12(b)(1) and 12(b)(3) for lack of subject matter jurisdiction and improper venue based on an arbitration clause in a contract between Yuri Kuklachev and Gelfman, Inc. This is properly addressed as a motion to dismiss.[2] For the reasons set forth below, the motion to compel arbitration is granted with respect to two claims and denied with respect to the remaining claims, the motion to dismiss pursuant to Rule 12(b)(6) is granted in part and denied in part, the motion to dismiss pursuant to Rule 9(b) is denied, and the motion to require a more definitive statement under 12(e) is denied.

## BACKGROUND

The following facts are taken from the plaintiffs' complaint and are taken as true for the purposes of the 12(b)(6) motion. Disputes are noted.

*The Parties*

Yuri Kuklachev ("Kuklachev") is a Russian national who tours

---

[2] *See*, *e.g.*, *Kowalewski v. Samandarov*, 2008 U.S. Dist. LEXIS 85616 at *1 (S.D.N.Y. October 23, 2008).

the world with his troupe of cats and clowns, putting on theatrical performances. Kuklachev performs in the shows, manages the troupe, and organizes performances. Dmitri Kuklachev is Yuri Kuklachev's son, and is the artistic director and star performer of the troupe.

Defendant Mark Gelfman is the president of Gelfman Inc., a promotional and management business for entertainments. Yanis Gelfman is Mark Gelfman's son and the general manager of Gelfman Inc. All three of these defendants are collectively referred to as "the Gelfmans."

Defendants Palace of Fine Arts, Wilkins Theater at Kean University (an entity of the State of New Jersey), Gwinnett Center, Napa Valley Opera House, Wilshire Ebell Theater, and Seattle Repertory Theater are venues that plaintiffs claim hosted shows produced by the Gelfmans that allegedly infringed upon plaintiffs' trademarks.

Defendants Onlineseats.com and Ticketmaster.com are online ticket vendors that plaintiffs claim sold tickets to the allegedly infringing shows.

Defendants Yuri Potoski, Michael Zlotnikov, Andrey Yankovis, Stanislav Nemoy, Vladimir Krasnolozhkin, Vladimir Anisimov, and Dmitry Krassotkine were performers and crew members in the production of the allegedly infringing show.

*Historical Background*

In the early 1970's, plaintiff Kuklachev, a well-recognized clown, became known for public entertainments performed with his troupe of cat performers and clowns. Complaint at ¶ 44 ("Compl."). Rather than training the cats to perform tricks, Kuklachev selected his cats for each role based on their individual skills and preferences, much like actors in a theater. *Id.* at ¶ 45. By the mid-1970's, Kuklachev's cat performances were a recognized success in various countries and in the United States. *Id.* at ¶ 46. Excerpts from Kuklachev's shows have been shown on television stations in various countries, including the United States, and have been discussed in multiple entertainment news reports. *Id.* at ¶ 46. In the former USSR, Kuklachev's performances were included in children's television shows, official state concerts, and transmitted on Soviet television channels. *Id.* Busts and action figures of Kuklachev with his cats were created in Russia and exported to other countries. *Id.* Plaintiffs won numerous entertainment awards for their work. *Id.* at ¶ 49.

The theater in Moscow is a popular tourist destination, and is apparently the only venue in the world that specializes in performances by cats. *Id.* at ¶ 50.

Kuklachev first toured the United States in 1977, and returned to the United States again in 1980. *Id.* at ¶ 47. During

plaintiffs' 2001 tour of the United States, the Arizona Republic referred to the show as "Kuklachov's[3] Moscow Cat Theater." *Id*. at ¶ 61, Ex. B.

*2005 and 2006 Tours*

In 2005 and 2006, Kuklachev brought his performance to the United States for an extended tour, during which there were numerous successful performances, all under the name of "Moscow Cats Theatre." *Id*. at ¶ 50. For these tours, Kuklachev hired defendants to assist the plaintiffs in arranging and marketing their performances. *Id*. at ¶ 59. There were no prior business relations between the plaintiffs and defendants. *Id.*

Prior to commencing the 2005 tour, Yuri Kuklachev and Gelfman Inc. signed a contract.[4] The contract designates Gelfman Inc. as "Promoter" and Yuri Kuklachev as "Artist," and states that the document is a "performance agreement" for the performance of "Kuklachev's Cat Theater," which is called the "Show" (Dmitri Kuklachev was not a party to this contract). Gelfman Aff. Ex. A. The duration of the contract was from September 9, 2005 to September 9, 2007. The contract states that the "Promoter engages Artist to perform the Show," and refers to

---

[3]Although plaintiffs' name is spelled "Kuklachev," it is pronounced "Kuklachov."

[4]The contract is undated.

the Show as a product of "[the Artist's] theater." *Id*. at 2. The Promoter agrees not to "contract with or promote any other performances [inside the United States] during the duration of this Agreement... that utilizes animals as the essential and predominant part of their performance." *Id*. The promoter "has no right to engage any other artist" to work in the Show or to be included in performances. *Id*. *Id*. at 5. The contract states that the Artist will provide the Promoter with information, photographs, and other information for the purpose of advertising the show. *Id*. at 6. The Promoter promises up to three minutes of video recording of the show for use in advertising. *Id*. The Promoter agrees to pay for living expenses, animal and veterinary expenses, travel expenses, laundry expenses, and commercial liability insurance. *Id*. at 7-9.

Upon Kuklachev's arrival in the United States in 2005, major news outlets in the United States published stories about Kuklachev and his many years of work with the Moscow Cats Theatre. *Id*. at ¶ 55. In interviews on several television shows to promote his performances, Kuklachev related the history of how he had founded the Moscow Cats Theatre thirty years prior. *Id.* at ¶ 57.

In 2005, the plaintiffs brought an extensive assortment of scenic stage materials and props into the United States from Russia, some of which were manufactured specifically for the

Moscow Cats Theatre. *Id*. at ¶ 183. In late December 2006, Gelfman asked Kuklachev to store the scenic materials in the United States under Gelfman's supervision, in order to save the money required to transport the materials. *Id*. at ¶ 186. Defendants thereafter used some of plaintiffs' scenic materials for their shows, in particular, a background scene portraying a view of Paris out of a clown-artist's studio, which was developed and ordered by Kuklachev in Moscow for use in his expected 2007 United States Tour. *Id.* at ¶¶ 167, 189.

*The 2007 Tour*

In early 2007, plaintiffs began planning another tour of the Moscow Cats Theatre to the United States, expecting to continue their cooperation with defendants. *Id*. at ¶ 62. At that time, the plaintiffs learned that another cat based theatrical group was already performing in the United States under the name "Moscow Cats Theatre." *Id*. at ¶ 67.

The performances conducted by the Gelfmans are similar in nature to the ones performed by plaintiffs, using similar promotional methods. *Id.* at ¶ 74. The lead performer in defendant's show acts in a similar manner to Kuklachev, dresses in a similar costume, and wears similar makeup and hairstyle, leading to cases of mistaken identity by the audience. *Id*. at ¶ 74. The Gelfmans' stage set up, show themes, devices, and tricks

are in many cases identical to those used by plaintiffs. *Id.* at ¶ 75. Examples include: using birdfeeders at stage right and left for the cats to hide in during the show, cats riding electric cars and pushing carts with other animals in them, cats jumping from a long pole into a small pillow in a clown's hands, and cats on rockinghorses. *Id.* at ¶ 76, 77. One particularly elaborate sketch designed and used by the plaintiffs appears in the Gelfmans' shows: a clown lies down to sleep and turns off a light, at which point an animal comes on stage and turns the light back on, angering the clown, who smashes the lamp bulb. *Id.* at ¶ 77. The animal returns to the stage and appears to eat the glass fragments. When the animal leaves the stage, the audience sees a light bulb shining under its tail. *Id.*

For their performances, defendants conducted an advertising campaign that included the terms "Moscow Cats Theatre" and "Moscow Cats" in conjunction with plaintiffs' likenesses and images and plaintiffs' Moscow Cats Theater promotional materials.

Defendant Gelfman used a poster showing an image of Dmitri Kuklachev with a cat doing a "front-paw stand" on his hand[5] to show priority of the use of the trademark when making his application to the United States Patent and Trademark Office. *Id.* at ¶ 71. This poster advertised the 2007 Los Angeles and San

---

[5] Plaintiffs consider this to be one of their signature tricks. Declaration of Dmitri Kuklachev at ¶ 20.

Francisco tours of the allegedly infringing show. *Id.* This poster also contained the words "World's Only" in front of the term "Moscow Cats Theatre." *Id.* at ¶ 72. Additional posters and other performance-related materials bear portraits of Kuklachev and other references to plaintiffs. *Id.* at ¶ 73. The defendants also sold copies of promotional materials, including T-shirts, key chains, and recordings of plaintiffs' performances, developed by plaintiffs. *Id.* at ¶ 168. These advertising and promotional materials caused actual confusion among the members of the audience, who thought that Kuklachev and his troupe were performing in Gelfman's shows. *Id.* at ¶ 69. Confused audience members contacted the Moscow Cats Theatre in Moscow demanding their money back for performances that were conducted by defendants. *Id.* at ¶ 70. Following various allegedly infringing performances, defendants and various theaters hosting performances were contacted by audience members upset with the absence of the Kuklachevs, who had been advertised as performing. *Id.* at ¶ 80.

A former employee of plaintiffs, defendant Vladimir Krasnolozhkin ("Krasnolozhkin"), was hired by defendants to perform in defendants' show. *Id.* at ¶ 64, 65. Krasnolozhkin was discharged from the Moscow Cats Theatre in the 1990s, after which he toured remote areas of Russia with a show that he falsely presented as Kuklachev's Cats Theater. *Id.* at ¶ 65.

Krasnolozhkin, who physically resembles Kuklachev, dyed his hair and altered his dress in order to pass as Kuklachev himself. *Id*. Russian authorities familiar with the Kuklachev's Theatre stopped these performances. *Id*.

In 2005, Gelfman registered the domain name moscowcatstheatre.com for purposes of promotion and advertisement and advertisement of Kuklachev's 2005 and 2006 tours. *Id*. at ¶ 68.[6] In early 2007, defendants began using the domain to advertise the allegedly infringing performances. *Id*.

Upon learning of the allegedly infringing show in the United States, plaintiffs sent a cease and desist letter to Gelfman. *Id*. at ¶ 79. Gelfman continued to use the trademark and likenesses of plaintiffs for advertizing, and new performances were scheduled by defendants following the letter. *Id*.


*Trademark Applications*

Neither plaintiffs nor defendants have a registered trademark for the "Moscow Cats Theatre" mark. On January 4, 2007, a few days after plaintiffs left the country following the 2006 tour, Gelfman filed a trademark application with the United States Patent and Trademark Office, seeking to register the "Moscow Cats Theatre" trademark in his name. *Id*. at ¶ 63. In

---

[6]*See also* http://www.whois.net for registration information and http://www.archive.org for archived images of earlier versions of the website.

August and September of 2007, plaintiffs initiated proceedings before the Trademark Trial and Appeal Board of the United State Patent and Trademark Office, opposing the registration of the "Moscow Cats Theater" trademark by Gelfman. *Id.* at ¶ 81. Both oppositions are currently pending before the Board. *Id.* Kuklachev has also applied for registration of his common law rights in the "Moscow Cats Theater" trademark, which registration is pending. *Id.* at ¶ 82.

## DISCUSSION

### I. Jurisdiction

This Court has federal question jurisdiction over this the plaintiffs' Lanham Act and Copyright Act claims, pursuant to 15 U.S.C. § 1121, 28 U.S.C. § 1338 and 28 U.S.C. § 1331, and supplemental jurisdiction over the state law and common law claims, pursuant to 28 U.S.C. § 1367.

### II. Standing

This motion to dismiss was filed on behalf of defendants Gelfman Inc., Mark Gelfman, and Yanis Gelfman (for the purposes of this section only, "movants"). There is no indication that their counsel, James F. Woods, represents the other defendants in this action, and it appears from other submissions in this action that he does not. Movants assert that various claims listed in

the complaint do not apply to defendant venues, and as such must be dismissed. Movants also make substantive arguments on behalf of venues sued by plaintiffs, particularly with regards to contributory trademark infringement. Additionally, movants protest the plaintiffs' use of the term "the defendants" to refer at times to movants and at other times to all defendants in this action, stating that these references make the claims ambiguous.

Movants do not have standing to move on behalf of other defendants to this action. *See Ashcroft v. Dep't of Corr.*, 2007 U.S. Dist. LEXIS 49079 at * 24-26 (W.D.N.Y. July 6, 2007). This opinion will discuss only claims impacting the movants, and will only dispose of claims with respect to them.

## III. Standards

*12(b)(6) Standard*

When considering a motion to dismiss under Rule 12(b)(6), a trial court must "accept as true all factual statements alleged in the complaint and draw all reasonable inferences in favor of the non-moving party." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007) (citation omitted), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Indeed, conclusory allegations "will not suffice to prevent a motion to dismiss." *Smith v. Local 819*

*I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

To survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1970; 550 U.S. 544; 167 L. Ed. 2d 929 (2007). Although the complaint need not provide "detailed factual allegations," *id*. at 1964; *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n. 2 (2d Cir. 2007) (applying the standard of plausibility outside *Twombly*'s anti-trust context), it must "amplify a claim with some factual allegations... to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d 143, 157-158 (2d Cir. 2007) (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11). The complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

*9(b) Standard*

Rule 9(b) of the Federal Rules of Civil Procedure requires that the circumstances constituting fraud or mistake shall be stated with particularity. Fed. R. Civ. P. 9(b). However, "[m]alice, intent, knowledge, and other conditions of mind of a person's mind may be alleged generally." *Id*. The rule is "intended to ensure that each defendant is provided with reasonable detail concerning the nature of his particular involvement in the alleged fraud." *The Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y.1985). Fraud allegations in a complaint therefore must: "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Shields v. Citytrust Bancorp, Inc*., 25 F.3d 1124, 1128 (2d Cir. 1994). Although the scienter requirement need not be plead with particularity, "[i]n order to avoid abuse... plaintiffs are required to allege facts that give rise to a strong inference of fraudulent intent." *Campaniello Imports, Ltd. v. Saporiti Italia S.P.A.*, 117 F.3d 655, 663 (2d Cir. 1997) (internal quotation marks and citations omitted). The requisite "strong inference" of fraud may be established either (a) by alleging facts to show that defendants had both motive and

opportunity to commit fraud, or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness. *Shields*, 25 F.3d at 1128.

In cases involving multiple defendants, Rule 9(b) requires that the pleading identify the nature of each defendant's participation in the alleged fraud. *DiVittorio v. Equidyne Extractive Industries*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir. 1986).

*12(e) Standard*

Rule 12(e) allows for an order requiring a more definite statement when the pleading is so vague that the opposing party cannot reasonably be required to respond. Whether to grant a motion for a more definite statement is in the discretion of the court. 5A CHARLES A. WRIGHT& ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1377 (2d ed. 1990); *see also Vaden v. Lantz*, 459 F.Supp.2d 149, 150 (D. Conn. 2006). For a more definite statement to be warranted, the complaint must be "so excessively vague and ambiguous as to be unintelligible and as to prejudice the defendant seriously in attempting to answer it." *Kok v. First Unum Life Ins. Co.*, 154 F.Supp.2d 777, 781-82 (S.D.N.Y. 2001). The rule "is designed to remedy unintelligible pleadings, not to correct for lack of detail." *Dunlop-McCullen v. Local 1-S RWDSU-AFL-CIO*, 1994 U.S. Dist. LEXIS 12245 at *2 (S.D.N.Y.

September 1, 1994). When a complaint satisfies Rule 8, then the Rule 12(e) motion should be denied. *Vapac Music Publ'g, Inc. v. Tuff'N'Rumble Mgmt.*, 2000 U.S. Dist. LEXIS 10027, *6 (S.D.N.Y. July 19, 2000). Federal Rule of Civil Procedure 8 merely requires "a short and plain statement of the claim." The preferred course is to encourage the use of discovery to inform the defendant of the factual basis of the complaint. *Greater New York Auto Dealers Ass'n v. Environmental Systems Testing, Inc.*, 211 F.R.D. 71, 77 (E.D.N.Y. 2002).

## IV. A More Definite Statement is Not Required

Defendants argue that Count I of the complaint, stating various Lanham Act claims, including trademark infringement, false representation, and damage to business reputation, is ambiguous and an improper combination of different theories of liability "that makes answering and defending... virtually impossible." Woods Decl. at ¶ 29. Defendants also argue that plaintiffs' references to different marks throughout the pleadings, such as "Moscow Cats Theatre" and "Cats Theatre," is unclear and ambiguous. *Id.* at ¶ 31. Defendants also argue with respect to numerous claims that the claims as to co-defendants in this action are unclear, a claim that defendants lack standing to make.

Defendants have not come close to showing that the complaint

is "so excessively vague and ambiguous as to be unintelligible."
*Kok,* 154 F. Supp.2d at 782. The complaint clearly sets out
distinct claims and the laws pursuant to which claims are made.
The claims for trademark infringement, false representation, and
damage to business reputation all arise under the same section of
the Lanham Act and are governed by similar tests under caselaw.
There is no inherent difficulty in defending against the first
cause of action. Plaintiffs' reference to the highly similar
terms "Moscow Cats Theatre" and "Cats Theatre" does not render
plaintiffs' claims ambiguous. Defendant's motion to dismiss
pursuance to Rule 12(e) is denied.

**V. Arbitration**[7]

Defendants claim that this court lacks subject matter
jurisdiction over plaintiffs' claims, due to the existence of an
arbitration clause in the contract between Yuri Kuklachev and
Gelfman, Inc. (the "Contract"), which states that "[a]ll claims
arising from this Agreement shall be settled by an arbitrator."
Contract at § 10(A). Defendants argue that the allegations
underlying plaintiffs' complaint "touch matters" governed by the

---

[7]Defendants moved to dismiss plaintiffs' complaint on the ground that
the claims must be arbitrated. The parties exchanged several papers on the
arbitration issue, including a sur-reply and a sur-sur-reply. Subsequently,
defendants moved to stay litigation and compel arbitration of the plaintiffs'
claims. The latter motion has not yet been fully briefed. However, because
this issue was first raised in the motion to dismiss, and because the
arguments have been fully briefed pursuant to the motion to dismiss, the issue
is considered and resolved here.

contract, thereby triggering the arbitration clause.

The Federal Arbitration Act ("FAA") provides that "an agreement in writing to submit to arbitration an existing controversy... shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. Where a contract contains an arbitration clause, there is a "presumption of arbitrability." *AT&T Techs., Inc., v. Communications Workers of America*, 475 U.S. 643 (1986); *Ace Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 28 (2d Cir. 2002). In determining whether a contract contains an agreement to arbitrate, and whether that arbitration agreement applies to a given dispute, doubts must be resolved in favor of arbitrability. *Id*. at 650; *Concourse Village, Inc. v. Local 32E*, 822 F.2d 302, 304 (2d Cir. 1987). However, "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc*., 252 F.3d 218, 224 (2d Cir. 2001) (quoting *AT & T Techs.,* 475 U.S. at 648). A court asked to stay proceedings pending arbitration must make the following determinations: (1) whether the parties agreed to arbitrate; (2) the scope of the arbitration agreement; (3) whether Congress intended the federal statutory claims asserted by the plaintiff to be nonarbitrable; and (4) if not all of the claims in the case are arbitrable, whether the court should stay

the balance of proceedings pending arbitration. *See Genesco, Inc. v. T. Kakiuchi & Co., Ltd*, 815 F.2d 840, 844 (2d Cir. 1987). The parties do not contend that Congress intended the federal claims at issue here to be non-arbitrable. I proceed to consider the remaining determinations.

## A. Agreement to Arbitrate and Estoppel

There is no dispute that Yuri Kuklachev and Gelfman, Inc. agreed to arbitrate disputes arising from their contract. The parties differ as to whether other parties to this action are so bound. Plaintiffs assert that Dmitri Kuklachev, being not a party to the contract, cannot be bound by its arbitration clause. Plaintiffs further argue that Mark Gelfman and Yanis Gelfman were not parties to the contract, and therefore Yuri Kuklachev did not agree to arbitrate disputes with them.

"[A] party cannot be required to submit to arbitration any dispute which he has not agreed so to submit." *Louis Dreyfus Negoce*, 252 F.3d at 224. However, a non-signatory may be estopped from resisting arbitration if he has "derived other benefits under the agreement containing the arbitration clause." *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999); *see also American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999). Furthermore, "the signatory to an arbitration agreement is

estopped from avoiding arbitration with a non-signatory when the issues the non-signatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed." *Contec Corp v. Remote Solution, Co.*, 398 F.3d 205, 209 (2d Cir. 2005) (internal quotation marks and citation omitted). Additionally, "the acts of employees of a party to an arbitration agreement are arbitrable as long as the challenged acts fall within the scope of the [contract]." *Mosca v. Doctors Assocs.*, 852 F. Supp. 152, 155 (E.D.N.Y. 1993).

There is no indication that Dmitri performed in any of the shows pursuant to the contract. It appears that the plan was for Dmitri to perform in the 2007 tour that did not take place. Affidavit of Dmitri Kuklachev dated October 21, 2008, at ¶ 14 ("Dmitri Aff."). Defendants state that Dmitri Kuklachev is required to arbitrate as an employee of Yuri Kuklachev. However, the record is unclear as to the existence of such an employment relationship. In any case, the case cited refers to the "acts of employees;" the acts of Dmitri Kuklachev are not at issue in this case. *Mosca*, 852 F. Supp. at 155. Defendants suggest that Dmitri Kuklachev is a party to the contract as one of the "members" of Yuri Kuklachev's troupe, but the contract does not indicate that 'members' are contracting parties. *See* Contract § 1. Defendants'

only plausible ground for estoppel[8] is their argument that Dmitri

Kuklachev benefitted under the agreement when he gained publicity

and exposure in 2005, at which time he made media appearances to

promote his father's show. Dmitri Kuklachev states in his

affidavit that he appeared on national television and was

interviewed by journalists from leading American media

publications, including the Boston Globe and the New York times.

Dmitri Aff. at ¶ 14. Defendants do not state specifically that

Gelfman, Inc. arranged these appearances, but they do state that

Dmitri Kuklachev gained benefits "through the publicity efforts"

of Gelfman, Inc., made pursuant to the contract's publicity

clause. It is unlikely that Dmitri Kuklachev would have arranged

his own media appearances. Accordingly, I conclude that Gelfman,

Inc.'s actions conferred a benefit on Dmitri Kuklachev.

Furthermore, to the extent that the Moscow Cats Theatre gained

favorable reviews during the 2005 and 2006 tours, Dmitri

Kuklachev benefitted as a person with an economic stake in the

theater. *See* Dmitri Aff. at ¶ 17 (describing the Moscow Cats

Theatre as "my theater"). To the extent that claims must be

arbitrated, Dmitri Kuklachev is estopped from resisting

---

[8]Defendants point to an email by plaintiffs' attorney that contemplated a switch-over between Yuri Kuklachev and Dmitri Kuklachev, whereby Dmitri would come to the United States and take over performances of the show. Affidavit of Mark Gelfman dated February 9, 2009, Ex. D. Defendants claim that this indicates that Dmitri received benefits under the contract. However, attorney for Gelfman, Inc. marked "NO" in the margin next to this comment, indicating that Gelfman, Inc. did not agree to this suggestion. *Id*. The suggestion that Dmitri would perform under the contract does not indicate that Dmitri did, in fact, receive benefits under the contract.

arbitration and continuing in litigation.

Regarding Mark and Yanis Gelfman, it is clear that the claims made by plaintiffs against Mark and Yanis Gelfman overlap substantially with claims made against Gelfman, Inc. The person who carried out the obligations of Gelfman, Inc. pursuant to the contract was Mark Gelfman, and Yanis Gelfman was his employee. Plaintiffs have made no distinction between Gelfman, Inc. and Mark Gelfman in their complaint. If any of plaintiffs' claims against Gelfman, Inc. must be arbitrated pursuant to the contract, those claims as they pertain to Mark and Yanis Gelfman are intertwined with the contract between Yuri Kuklachev and Gelfman, Inc. *See Contec Corp*, 398 F.3d at 209. Yuri Kuklachev is estopped from avoiding arbitration with Mark Gelfman and Yanis Gelfman.

**B. Scope of the arbitration clause**[9]

*1. The Arbitration Clause is Broad*

If it is determined that parties agreed to arbitrate, a court must then determine the scope of the arbitration agreement.

---

[9]Plaintiffs argue that the arbitration clause is inapplicable here, because many of defendants' actions occurred after the expiration of the contract. A party's obligation under an arbitration clause survives the expiration of an agreement when the post-expiration action "infringes a right that accrued or vested under the agreement." *CPR (USA) Inc. v. Spray*, 187 F.3d 245, 255 (2d Cir. 1999). If it were determined that plaintiffs' claims amounted to allegations that defendants infringed rights contained in the contract, then the arbitration clause would apply beyond the expiration of the contract.

*Oldroyd v. Elmira Sav. Bank*, 134 F.3d 72, 76 (2d Cir. 1998). An arbitration clause may be broad or narrow. The phrase "arising under" is the only phrase recognized by the Court of Appeals to be a narrow arbitration clause. *Louis Dreyfus Negoce*, 252 F.3d at 225. "[T]he phrase 'arising from,' as opposed to 'arising under,' in an arbitration clause suggests a broad scope." *ACE Capital Re Overseas Ltd. v. Cent. United Life Ins. Co.*, 307 F.3d 24, 32 (2d Cir. 2002) (citing *Louis Dreyfus Negoce*, 252 F.3d at 226-227). In this case, the contract stated that all matters "arising from" the contract would be arbitrated, and as such the arbitration clause is considered broad.[10]

## 2. The Need for Factual Analysis

The strong federal presumption in favor of arbitrability applies with greater force when an arbitration clause is a broad

---

[10]The phrase "arising from" appears on its face to be less broad than other possible arbitration agreement language. For example, the Court of Appeals has stated that the "paradigm of a broad [arbitration] clause" is one that submits to arbitration "any claim or controversy arising out of or relating to the agreement." *Collins & Aikman Prods. Co. v. Building Sys.*, 58 F.3d 16, 20 (2d Cir. 1995). See also *ACE Capital*, 307 F.3d at 26 (holding that the clause, "any dispute [that] shall arise between the parties... with reference to the interpretation of this Agreement or their rights with respect to any transaction involved" was broad); Oldroyd v. Elmira Sav. Bank, 134 F.3d 72, 76 (2d Cir. 1998) ("any dispute, controversy or claim arising under or in connection with [the agreement]" was a broad arbitration clause); *Lewis Tree Serv., Inc. v. Lucent Techs., Inc.*, 239 F. Supp. 2d 332, 335-36 (S.D.N.Y. 2002) (holding that a clause covering "any controversy or claim... related directly or indirectly to this Agreement" was a broad arbitration clause).

In the interest of giving effect to the parties' expectations for the arbitration agreement, it would seem reasonable to read the phrase "arising from" as extending to fewer collateral matters than the broader clauses noted above. However, the Second Circuit does not appear to have recognized any such spectrum of breadth, stating only that broad clauses create a strong presumption of arbitrability.

one. *See AT & T Techs.*, 475 U.S. at 650. In the case of a broad

arbitration clause, the court "will compel arbitration unless it

may be said with positive assurance that the arbitration clause

is not susceptible of an interpretation that covers the asserted

dispute." *Collins & Aikman Prods. Co. v. Building Sys*., 58 F.3d

16, 19 (2d Cir. 1995). If, however, the dispute regards a matter

that is clearly collateral to the contract,

> then a court should test the presumption by reviewing
> the allegations underlying the dispute and by asking
> whether the claim alleged implicates issues of contract
> construction or the parties' rights and obligations
> under it. If the answer is yes, then the collateral
> dispute falls within the scope of the arbitration
> agreement; claims that present no question involving
> construction of the contract, and no questions in
> respect of the parties' rights and obligations under
> it, are beyond the scope of the arbitration agreement.

*Collins*, 58 F.3d at 23.

The arbitrability analysis must "focus on the factual

allegations in the complaint rather than the legal causes of

action asserted." *Genesco, Inc.*, 815 F.2d at 846. Courts must

examine the substance of claims, "shorn of their labels."

*Phillips v. Audio Active Ltd.*, 494 F.3d 378, 388 (2d Cir. 2007).

"The mere fact that [a complaint alleges] a tort claim, rather

than one for breach of [contract], does not make the claim any

less arbitrable." *Collins*, 58 f.3d at 23.

Several formulations exist for assessing the relationship

between the allegations in a complaint and a contract containing

an arbitration clause. Defendants assert that the proper inquiry is whether the factual allegations in the complaint "touch matters covered by the parties' agreements." *Genesco*, 815 F.2d at 846. However, "[i]t is not particularly helpful... to recite the various rules governing whether factual allegations subject a matter to arbitration: some of these rules ask, for example, whether the factual allegations 'touch matters' governed by the parties' contracts; whether the allegations 'arise from' contract performance; whether they are 'integrally linked' to the contractual relation; or whether they somehow 'pertain to' it. None of these formulations itself yields a principled way of here deciding whether these claims should be sent to arbitration." *Leadertex, Inc. v. Morganton Dyeing & Finishing Corp*., 67 F.3d 20, 28 (2d Cir. 1995) (citations omitted). Instead, as with any contractual matter, the "main concern in deciding the scope of arbitration agreements is to faithfully reflect the reasonable expectations of those who commit themselves to be bound by them." *Id*. at 28; *accord XL Capital, Ltd. v. Kronenberg*, 145 Fed. Appx. 384, 385 (2d Cir. 2005).

Taking together the *Collins* requirement to determine whether the plaintiff's claims require the court to evaluate the contract, and the *Genesco* directive to look at the factual allegations underlying the complaint, a court should determine whether the factual allegations that form the basis of a

plaintiff's claims implicate construction of the contract or present questions respecting the parties rights and obligations under the contract. If the factual allegations that form the basis for the claims do not pertain to the contract, the matter is not arbitrable. The inquiry is fact-based and respects the parties' reasonable expectations in forming the contract.

### 3. Application of Fact-Analysis to Plaintiffs' Complaint

Two questions must be considered in order to determine whether arbitration is required: (1) whether the existence of an exclusivity clause in the contract forbidding Gelfman, Inc. from promoting any other performances requires this matter to be arbitrated, on the theory that plaintiffs have pled facts that could give rise to a breach of contract claim; (2) whether, outside of the exclusivity clause, the individual claims in the complaint relate to the contract.

### (i) Exclusivity Clause

Prior to conducting an analysis of the claims in the complaint, it must be noted that one of the facts underlying plaintiffs' claims -- that the Gelfmans promoted animal performances during the contract period -- could support a breach of contract claim. The contract contains several exclusivity provisions, including one by which Gelfman, Inc. agreed that it

would not "promote any other performances" involving animals as central performance elements in the United States during the duration of the contract and the ensuing option period, which the parties agreed would end on November 9, 2007. Contract § 2(C)(i). This clause was not noted or discussed in the parties' submissions. Plaintiffs have based their claims on performances by the Gelfmans that took place both before and after this date. However, although plaintiffs' claims include an allegation that the Gelfmans promoted animal performances during the contract period, this fact does not form the basis for plaintiffs' claims. The allegations upon which the claims are based are broad in scope and do not pertain to the contract. The existence of the contract was not a factual predicate for this dispute. These points set this case apart from cases in which the courts have ordered arbitration based on the facts underlying the complaint.

In Court of Appeals and District cases finding various claims not sounding in contract to be arbitrable, the plaintiffs' claims relied heavily on factual allegations that implicated the parties' contracts. In these cases, the claims could not have arisen had there not been a prior contract between the parties. In cases cited by defendants in which the courts found that the underlying facts required arbitration, despite the fact that the claims did not sound in contract, the facts alleged amounted to claims related to the contract - either breach of contract,

conspiracy to deprive plaintiff of rights under the contract, or examining the parties' performance under the contract. In these cases, the claims could not have arisen had there not been a prior contact between the parties. *See Genesco*, 815 F.2d 840 (where plaintiff alleged that defendants conspired to defraud it and supply it with defective goods pursuant to several sales agreements, court found that plaintiff's allegations all derived from the parties' transactions under the agreements, and amounted to a claim that the goods sold did not meet the standards and prices of the parties' agreements, and therefore claims were arbitrable); *JLM Industries, Inc. v. Stolt-Nielsen, S.A.*, 387 F.3d 163 (2d Cir. 2004) (where plaintiffs' Sherman Act claims reduced to allegations that the price terms set forth in numerous contracts were artificially inflated as a result of a price-fixing conspiracy, and the claims could not have arisen absent the contracts, the claims were arbitrable); *Collins*, 58 F.3d 16 (where plaintiff claimed that defendant libeled its business, and the libel was made in furtherance of unlawful termination of a contract, claim was arbitrable); *Mehler v. Terminix Int. Co.*, 205 F.3d 44 (2d Cir. 2000) (where a termite exterminator punctured an oil line while performing service under the contract, thus failing to conform with its contractual agreement to perform its task in a certain way, claims for property damage and personal injury were arbitrable); *Mann v. N.A.S.A. Int'l., Inc.*, 2000-2

Trade Cas. (CCH) P73,124 (S.D.N.Y. August 21, 2000) (where defendant casino posted on its website that it was insured by Lloyd's of London, in violation of a non-disclosure agreement in its contract with Lloyd's, plaintiff Lloyd's Trademark infringement claim based on the posting was arbitrable); *Flightdocs, Inc. v. Jackson*, 2005 U.S. Dist. LEXIS 46469 (E.D.N.Y. August 23, 2005) (plaintiff's claim of tortious interference with contract, based on defendants alleged inducement of a contract breach, was arbitrable); *Gidatex v. Campaniello Imports, Ltd.*, 13 F.Supp.2d 420 (S.D.N.Y. 1998) (because plaintiff's unfair competition and misappropriation claims sought to protect goodwill developed while plaintiff was operating as distributor of defendant's furniture under the contract, which would require assessment of performance under the contract, claims were arbitrable); *Norcom Electronics Corp. v. CIM USA Inc.*, 104 F.Supp.2d 198 (S.D.N.Y. 2000) (where plaintiff's claim of tortious interference tracked allegations in its breach of contact claim, and other allegations directly related to provisions in the contract, claims were arbitrable).

An example of a non-arbitrable claim involving factual allegations related to a contract is found in *Leadertex*, 67 F.3d 20, in which the court held that a libel claim concerned matters beyond the scope of the contract, despite the fact that the allegedly libelous statements were made pursuant to a delivery of

goods under the contract. In *Leadertex*, plaintiff was a small
textile converting business, which supplied raw materials to
defendant for dyeing, after which plaintiff would sell the
finished materials to third parties. *Id.* at 22. The relationship
was governed by a contract with an arbitration clause. *Id.* at 22-
23. A dispute arose concerning defective goods; plaintiff's
customers returned goods to plaintiff, which then refused to pay
defendant. *Id.* at 23. At some point, defendant made a defamatory
statement to one of the third party customers who had rejected
fabrics, claiming that plaintiff was dishonest and incompetent
and that it acted with intent to defraud its customers. *Id.* at
28. The Court of Appeals recognized that the defamation claim was
closely related to the contract claims, and that because truth is
a defense to defamation, resolution of the claim would require
examining evidence regarding contractual performance. *Id*.
However, "at the same time, the defamatory statement also
allegedly contained a number of charges extending beyond core
issues of dyeing and finishing goods contracts." *Id*. After
finding unhelpful the usual metrics for judging the relationship
between the allegations of a complaint and a contract, including
the "touch matters" formulation, the Court found that the content
of the allegedly defamatory statement extended to matters beyond
the parties' contractual relationship. *Id*. "There is nothing to
indicate that, when [plaintiff and defendant] included an

arbitration clause in their dyeing and warehousing agreement, they could reasonably have expected, or even contemplated, that the clause also would extend to a defamation claim based on statements about subjects other than [defendant's] services for [plaintiff]." *Id*. at 28-29. On that ground, the Court upheld the District Court's order denying defendant's motion to compel arbitration.

In this case, there is nothing to indicate that the exclusivity clause in the contract contemplated the possibility that Gelfman, Inc. would promote performances copying plaintiffs' performances. In this case, the crux of plaintiffs' complaint is not that the Gelfmans promoted animal performances during the contract period, but rather that the Gelfmans allegedly stole plaintiffs' intellectual material. The agreement to arbitrate a dispute regarding exclusivity does not translate into an agreement to arbitrate a dispute regarding theft of intellectual property.

*(ii) Analysis of Individual Claims*

With two exceptions, plaintiffs' claims and the factual allegations that underlie them do not relate to the contract, and thus are non-arbitrable. The claims can be divided into two broad categories: those concerning intellectual property, and the common law claims. As discussed further below, the fraud and

conversion claims do relate to the contract, and must be arbitrated. Plaintiffs' allegations pertaining to intellectual property and unjust enrichment do not pertain to the contract, and are non-arbitrable.

Had there been no contract between the parties, defendants could still have taken all of the actions with respect to intellectual property that they are alleged to have taken in this case. There is no allegation that defendants exploited the contractual relationship in order to facilitate the alleged theft of intellectual property, such as by gaining access to proprietary materials. The intellectual property and unjust enrichment claims do not require assessment of performance under the contract, nor do they require the fact finder to investigate actions taken pursuant to the contract. As described in further detail below, the facts underlying plaintiffs' intellectual property claims are not reducible to breach of contract claims, do not require interpretation of the contract, and do not implicate the parties' rights and obligations under the contract. Instead, the alleged copying and intentional infringement by the Gelfmans was beyond the scope of anything discussed in or contemplated by the contract.

I proceed to discuss the allegations of the complaint in further detail, mindful of the directive to consider whether the factual allegations underlying plaintiffs' claims require

interpretation of the contract or implicate the parties rights and duties under it.

*a. Two Different Shows: New York Tarnishment and Dilution Claim*

As a preliminary matter, it must be noted that the show that was the topic of the contract between Yuri Kuklachev and Gelfman, Inc. is a different show than the one giving rise to the dispute in this case. This is relevant to the analysis of plaintiffs' seventh claim, in which plaintiffs allege that defendants have created a likelihood of injury to plaintiffs' business reputation and of dilution of the distinctive quality of plaintiffs' "Moscow Cats Theatre" trade name, due to the allegedly poor quality of the Gelfman performances. Defendants argue that because the contract confers artistic control over the show to Yuri Kuklachev, this claim amounts to a breach of contract claim and must be arbitrated. However, although both the contract and plaintiffs' complaint concern the performance of cat theater, the two documents refer to two different shows. The contract pertains to a show called "Kuklachev's Cat Theater" (the "Kuklachev Show"). Plaintiffs allege that the Gelfmans copied the costumes, tricks, style and advertising of plaintiffs' show and used all of these materials to create their own show, which had an entirely different cast, crew, and leadership from the performances by plaintiffs (the "Gelfman Show"). In this case, the contract

created rights and obligations pertaining to Kuklachev's Show, whereas the dispute concerns Gelfman's show. Yuri Kuklachev's right to control the content of the Kuklachev Show did not extend to the Gelfman Show.[11]

That there are two different shows at issue sets this case apart from other cases in which the courts have compelled arbitration. In *Norcom Electronics*, 104 F.Supp.2d 198, a case relied upon heavily by defendants, the court found that a distribution dispute regarding a certain brand of embossing machine related to a contract for the earlier distribution of that same brand of embossing machine, and therefore arbitration was required. Similarly, in *Gidatex*, 13 F.Supp.2d 420, there was a dispute regarding the distribution of furniture, following an agreement for the distribution of that same brand of furniture. Both *Norcom* and *Gidatex* consider disagreements where the subject of the contract was the same item as the subject of the disagreement, unlike in this case.

*b. Rights to the Moscow Cats Theatre Mark*

---

[11]In their attempt to forge connections between the complaint and the contract, defendants also point to plaintiffs' statement in the complaint that Mark Gelfman contacted and hired two defendant performers to perform in the Gelfman Show, which they allege violates Gelfman, Inc.'s agreement not to hire any other artist to perform in the Kuklachev Show. The contractual provision does not pertain to shows other than the Kuklachev Show, and is therefore unrelated to plaintiffs' statement in the complaint. Moreover, the assertion that Gelfman hired other performers does not form the basis of any of plaintiffs' claims.

Plaintiffs' first claim alleges that defendants infringed on plaintiffs' "Moscow Cats Theatre" mark by promoting and conducting a tour of cat performances produced by Gelfman under the name "Moscow Cats Theatre." The contract makes no mention of the "Moscow Cats Theatre" mark, nor does it mention intellectual property rights. Plaintiffs allege that they own the "Moscow Cats Theatre" mark, that defendants used this mark in commerce, and that confusion resulted. Two submissions by plaintiffs offered in conjunction with plaintiffs' motion for a preliminary injunction against defendants indicated that audience members were confused by the Gelfman Show based on their long-term familiarity with the plaintiffs' performances, not due to performances that took place during the 2005 and 2006 seasons while plaintiffs were performing pursuant to the contract. *See* Letter from Natalya Goncharova, Affidavit of Nina Mavrodi.[12] Therefore, the facts underlying the "Moscow Cats Theatre" claim do not implicate the contract. No contract interpretation is required to adjudicate the parties' rights to the mark, nor does plaintiffs' claim of rights to the "Moscow Cats Theatre" mark present any question as to the parties' rights and duties under the contract.

*c. Copyright*

Claim eleven of the complaint alleges that defendants copied

---

[12]Available at Docket entry #63, attachments I-9 and I-11.

plaintiffs' performances, including tricks, sketches, themes, stage set up and design, costumes, promotional materials, and scenic elements, thereby causing confusion among audience members. Nothing in the contract pertains to the assignment of copyrights in plaintiffs' performance or promotional materials. There is no description in the contract of the nature of the tricks or other allegedly copyrighted materials, nor does the contract make any statement as to their ownership. The contract does not grant any proprietary access to defendants of secrets behind the tricks, or any information that would permit defendants to steal the tricks. Instead, defendants allegedly hired performers familiar with plaintiffs' performances in Russia, and paid close attention to the tricks as they were performed. There is no relationship between the contract and the copyright claim, nor do the factual allegations underlying the claim implicate the parties' rights or obligations under the contract.

*d. False Representation, Advertising, and Unfair Competition Claims*

The second, third, fifth, sixth, eighth, ninth and twelfth causes of action in the complaint make claims under the Lanham Act and New York law, alleging that defendants falsely represented that the Gelfman Show and the performances listed on

the moscowcatstheatre.com website were sponsored, endorsed, or authorized by plaintiffs, with the intent of confusing audiences.

The contract stated that Yuri Kuklachev agreed to provide Gelfman, Inc. with "press information, photographs, public appearances, artwork, and a bibliography for the purpose of marketing and advertising the Show." Contract at § 6(A). The contract further provided for royalty payments to be paid between the parties on the sale of merchandise. *Id*. at § 7(A). In their cybersquatting, publicity, and advertising claims, plaintiffs allege that defendants used their images and the moscowcatstheatre.com domain name in order to advertise infringing performances and sell merchandise, causing actual confusion amongst consumers who thought that plaintiffs were associated with the Gelfmans' performances. Defendants argue that these claims must be arbitrated, because they relate to the contract's section on publicity material. Regarding cybersquatting, nothing in the contract's section on publicity material refers to the moscowcatstheatre.com web domain or any other domain or website. The cybersquatting claim alleges that defendant intentionally misused the "Moscow Cats Theatre" domain name to confuse audiences into thinking that the Gelfman Show was associated with the plaintiffs. That the domain was originally used to advertise plaintiffs' show does not have any bearing on the question of whether defendants thereafter used the domain in

bad faith to confuse the public about the creative forces behind the Gelfman Show. The Cybersquatting claim does not pertain to the contract's advertising clause or any other clause in the contract.

Regarding the use of plaintiffs' names and images for promotion of Gelfman's Show, the Gelfmans claim that the contract could be read to give them rights to use photographs of plaintiffs, pursuant to the advertising clause. Whether or not the Gelfmans had the right to use these photographs is irrelevant to plaintiffs' claim, which alleges that defendants used plaintiffs' names and images to intentionally confuse audiences into thinking that plaintiffs had something to do with Gelfman's Show. The source of the photographs is immaterial to this claim. The factual allegations underlying the claim do not implicate the contract. However, to the extent that plaintiffs' claims rest on the allegation that defendants had no right to use plaintiffs' photographs in any circumstance, they must be arbitrated, as such a claim would require interpretation of the contract to determine whether Yuri Kuklachev conferred upon Gelfman, Inc. any rights to use photographs of himself or Dmitri Kuklachev beyond the conclusion of the working relationship between the parties.

Trade dress is not mentioned in the contract in any form, and defendants do not refer to this claim in their briefs. The facts underlying the claim are that defendants allegedly dressed

their performers in clothes resembling those worn in plaintiffs'
shows, and designed their posters to resemble plaintiffs'
posters, all in an attempt to confuse audiences into believing
there was a connection between the shows. Plaintiffs allege that
the distinctive features of their trade dress have been in place
for many years, long before the contract was formed. These facts
do not implicate the contract or the parties' rights or
obligations under it, and is therefore non-arbitrable.

Plaintiffs' unfair competition claims overlap strongly with
their false advertising and false representation claims, as they
allege that defendants intentionally confused audience members.
Plaintiffs contend that they have built up goodwill in their
names and the Moscow Cats Theatre mark over the course of thirty
years, and that defendants have intentionally confused audience
members into imputing that goodwill to their own performances.
The factual underpinnings of this claim do not pertain to the
contract. However, to the extent that the unfair competition
claims rely on goodwill developed during the 2005 and 2006 tours,
those aspects of the claims are arbitrable. *Gidatex*, 13 F.Supp.2d
at 426. To the extent that the goodwill was created before the
formation of the contract, the claims are non-arbitrable.

*e. Cases Cited by Defendants are not to the Contrary*

Defendants cite six cases for the proposition that Lanham

Act, copyright, unfair competition and other intellectual property claims generally fall within the scope of broad arbitration clauses. Defendants overlook the context dependency of the findings in these cases; none of the cases cited require a finding that plaintiffs' intellectual property claims are arbitrable. In *Kamakazi Music Corp. v. Robbins Music Corp.*, 684 F.2d 228 (2d Cir. 1982), the Court noted that an arbitration clause was broad enough to encompass copyright claims that required interpretation of the contract; no such interpretation is required here. In *American Diagnostica of Conn., Inc. v. Centerchem, Inc.*, 1996 U.S. Dist. LEXIS 1722 (S.D.N.Y. February 20, 1996), the Court found that a clause in the contract could be interpreted to control trademark claims, and therefore those claims must be arbitrated; no such clause exists here. In *Mann*, 2000-2 Trade Cas. (CCH) P73,124, the Court found that, where defendant's violation of a non-disclosure clause in the contract by placing the name of Lloyd's insurance on its website gave rise to plaintiffs' trademark claim, the trademark claim related to the contract and was arbitrable; there is no such connection in this case between defendants' actions and the contract. In *Gidatex*, 13 F.Supp.2d 420, the Court found that plaintiff sought to protect goodwill developed during the contract period, and therefore the unfair competition claim related to the contract. In this case, plaintiffs' unfair competition claims are founded

on the defendants' usurpation of goodwill that plaintiffs have developed over thirty years, a period far beyond the scope of the contract. The two remaining cases cited by defendants, *Meadows Indemnity Co. Ltd. v. Baccala & Shoop Ins. Servs. Inc.*, 760 F.Supp. 1036 (E.D.N.Y. 1991) and *Flightdocs*, 2005 U.S. Dist. LEXIS 46469, do not concern intellectual property.

*f. New York Common Law Claims*

In their tenth, thirteenth, and fourteenth claims, plaintiffs allege that defendants were unjustly enriched, that defendants committed fraud by inducing plaintiffs to leave their scenic materials in the United States when defendants knew that plaintiffs would not return for a 2007 tour, and that defendants converted plaintiffs' scenic materials to their own use. The conversion and fraud claims relate to the contract, and must be arbitrated. The unjust enrichment claim does not relate to the contract and is therefore non-arbitrable.

The Contract included a clause whereby Kuklachev agreed to "provide all props and extras necessary for the performance of the Show." Contract at § 8(E)(ii). Plaintiffs state that for the 2005 season, they brought an extensive assortment of scenic stage materials and props into the United States from Russia. Plaintiffs allege that in late December 2006, Gelfman requested that, in preparation for the 2007 tour, Kuklachev store all of

the scenic materials used in the show in the United States under
Gelfman's supervision, for the purpose of saving transportation
costs between the United States and Russia. Plaintiffs allege
that at the time Gelfman made this request, he was already
inviting other performers to perform under plaintiffs' name and
likeness, and that defendants have since used plaintiffs' scenic
materials for their allegedly infringing performances. In
particular, plaintiffs allege that defendants took a background
scene decoration, portraying a view of Paris out of a clown-
artist's studio, that plaintiffs allege was developed and ordered
by Kuklachev in Moscow for use in his expected 2007 United States
Tour. The scenic materials were brought to the United States
pursuant to the contract, and were stored by Gelfman in
anticipation of the 2007 tour that would take place under the
contract's requirements. Whether Gelfman misrepresented the
purpose of storing the materials and whether he kept them beyond
the time he was entitled to do so are questions that relate
directly to the contract. The fraud and conversion claims must be
arbitrated.

Plaintiffs allege that defendants were unjustly enriched by
the profits of Gelfman's Show, whose success depended on copying
the name, tricks, and style of Kuklachev's Show. These profits
came at plaintiffs' expense, since plaintiffs would have been
able to tour in the United States in 2007, were it not for

Gelfman's pending trademark application, which made it impossible for plaintiffs to persuade venues to host their show. Compl. at ¶ 209. This claim does not require construction of the contract, nor does it pertain to the parties' rights and duties under it. The matter of whether defendants' profits should be disgorged to plaintiffs based on actions neither described nor anticipated in the contract is outside the scope of the arbitration clause.

*g. Facts Unrelated to Plaintiffs' Claims*

Defendants point to additional factual allegations in the complaint that they claim relate to the contract, but which do not underlie plaintiffs' claims, nor do plaintiffs seek to recover from defendants based on these allegations. Instead, they are extraneous information not relevant to the suit (plaintiffs' extensive complaint contains 214 paragraphs and occupies 46 pages). Defendants point to plaintiffs' statement that they hired Mark Gelfman to assist them in arranging their 2005 tour, which defendants imply is in tension with the contract's description of the promoter/artist relationship. Whether plaintiffs' hired Gelfman, or whether Gelfman hired plaintiffs is immaterial to plaintiffs' claims, and does not serve as a foundation for them. Defendants next point to the statement in the complaint that "[Mark] Gelfman breached his duties to Kuklachev," and argue that any duties owed arose out of the contract. There is no indication

that plaintiffs used the word "duties" in the sense of invoking a contractual obligation. Mark Gelfman was not a party to the contract. None of the claims are based on the theory of breached duties, nor does the contract impose upon Gelfman a duty not to infringe upon plaintiffs' trademarks.

*h. Trademark Dilution, Fraud in Trademark Application, Tort*

Because I find that these claims must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6), as discussed further below, I do not consider whether they must be arbitrated.

## 4. Conclusion

With the exception of the conversion and fraud claims, plaintiffs' claims are non-arbitrable, except to the extent that they seek to protect goodwill generated during the course of the contract, and to the extent that they allege that defendants did not have a right to use plaintiffs' photographs for any purpose.

## C. Stay Pending Arbitration

Pursuant to the FAA, if a matter is arbitrable, a stay of the litigation as to that matter is entered pending completion of the arbitration. *See* 9 U.S.C. § 3. In addition, issues not subject to arbitration may be stayed "pursuant to the power inherent in every court to control the disposition of the cases

on its docket with economy of time and effort for itself, for counsel, and for litigants." *Worldcrisa Corp. v. Armstrong*, 129 F.3d 71, 76 (2d Cir. 1997) (internal quotation omitted). "Broad stay orders are... appropriate if the arbitrable claims predominate the lawsuit and the nonarbitrable claims are of questionable merit." *Genesco*, 815 F.2d at 856.

In this case, the majority of plaintiffs' claims are non-arbitrable. The two claims requiring arbitration are unrelated to the remaining claims. A broad stay order is therefore inappropriate. The conversion and fraud claims are stayed pending arbitration, and the remaining claims are not stayed.

## VI. Motion to Dismiss for Failure to State a Claim

### A. The Lanham Act Claims

### 1. Lanham Act

Section 43(a) of the Lanham Act provides, in relevant part: "(1) Any person who, on or in connection with any... services... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin... or false or misleading representation of fact, which--

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the

origin, sponsorship, or approval of his or her goods,

services, or commercial activities by another person, or

(B) in commercial advertising or promotion,

misrepresents the nature, characteristics, qualities, or

geographic origin of his or her or another person's goods,

services, or commercial activities,

shall be liable in a civil action by any person who

believes that he or she is or is likely to be damaged by

such act.

...

(2) In a civil action for trade dress infringement under

this Act for trade dress not registered on the principal

register, the person who asserts trade dress protection has

the burden of proving that the matter sought to be protected

is not functional.

15 U.S.C. § 1125(a).

Section 43(c) of the Lanham Act, also known as the Federal

Trademark Dilution Act ("FTDA"), provides, in pertinent part:

Subject to the principles of equity, the owner of a famous

mark that is distinctive, inherently or through acquired

distinctiveness, shall be entitled to an injunction against

another person who, at any time after the owner's mark has

become famous, commences use of a mark or trade name in

commerce that is likely to cause dilution by blurring or

dilution by tarnishment of the famous mark, regardless of

the presence or absence of actual or likely confusion, of

competition, or of actual economic injury.

15 U.S.C. § 1125(c)(1).

Section 43(d) of the Lanham Act, also known as the

Anticybersquatting Consumer Protection Act ("ACPA"), provides, in

pertinent part:

(A) A person shall be liable in a civil action by the owner

of a mark... if... that person--

(i) has a bad faith intent to profit from that mark...;

and

(ii) registers, traffics in, or uses a domain name

that--

(I) in the case of a mark that is distinctive at the

time of registration of the domain name, is identical or

confusingly similar to that mark;

15 U.S.C. § 1125(d)(1).


**2. Trademark Infringement (Claim I)**

"To state a claim for trademark infringement under sections

32(1)(a) and 43(a) of the Lanham Act, plaintiff[s] must allege

facts that establish that [their] mark merits protection and that

Defendants' use of [the] mark is likely to cause consumer

confusion as to the mark's source." *Arnold v. ABC, Inc*., No. 06

Civ. 1747(GBD), 2007 U.S. Dist. LEXIS 5802, at *2 (S.D.N.Y.
January 29, 2007), citing *Louis Vuitton Malletier v. Dooney &
Bourke*, Inc., 454 F.3d 108, 115 (2d Cir. 2006).

As discussed in a previous opinion in this case, plaintiffs
have established a likelihood that they own the Moscow Cats
Theatre mark, that the mark is distinctive through secondary
meaning, and a likelihood of confusion. *See Kuklachev v. Gelfman*,
2008 U.S. Dist. LEXIS 103332,. at *39-53 (E.D.N.Y. December 22,
2008). Plaintiffs have properly made out a claim for trademark
infringement under the Lanham Act. The motion to dismiss Claim I
of the complaint is denied.


**3. False Representation, Unfair Competition, False Designation,
and Trade Dress Infringement (Claims II, III, and XII)**

*False Designation and Unfair Competition*

Section 43(a) prohibits misrepresentations as to the source
of a product in primarily two types of activities: (1) false
designation, or "passing off" in which "A" sells its product
under "B's" name; and (2) false representation, or "false
advertising." *See Waldman Publishing Corp. v. Landoll, Inc*., 43
F.3d 775, 780 (2d Cir. 1994) (citing *Roho, Inc. v. Marquis*, 902
F.2d 356, 359 (5th Cir. 1990)). As with trademark infringement,
to prevail on a claim for false designation of origin under the
Lanham Act, a plaintiff must demonstrate consumers are likely to

be confused as to the source of the service because of the entrance in the marketplace of the defendant's mark. *Omicron*, 433 F. Supp.2d at 389. Plaintiffs have alleged that defendants are putting on performances using identical tricks, costumes, props, advertisements, and names to those used by plaintiffs, thereby passing off defendants' performances as ones produced by or affiliated with plaintiffs. Plaintiffs have also alleged that audience members were confused and believed that the allegedly infringing show was the product of plaintiffs. Plaintiffs believe that their reputations and potential profits from performances have been damaged as a result of defendants' actions. Plaintiffs have sufficiently pled a claim for false designation.[13]

*False Representation*

To have standing for a false advertising claim, "a plaintiff must be a competitor of the defendant and allege a competitive injury." *Telecom Int'l Am, Ltd. v. AT&T Corp.*, 280 F.3d 175, 197 (2d Cir. 2001). To obtain relief against a false or misleading advertisement, "a plaintiff must demonstrate by a preponderance of the evidence that an advertisement is literally false or that the advertisement, though literally true, is likely to mislead or

---

[13]Defendants appear to argue that the false designation and its accompanying unfair competition claim is preempted by the copyright claim. However, "claims that allege a false designation of origin via 'passing off' are not asserting rights equivalent to those protected by copyright and therefore do not encounter preemption." *Scholastic, Inc. v. Stouffer*, 124 F.Supp.2d 836, 848 (S.D.N.Y. 2000).

confuse consumers." *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1548-49 (2d Cir. 1991). When "a plaintiff's theory of recovery is premised upon a claim of implied falsehood, a plaintiff must demonstrate, by extrinsic evidence, that the challenged [advertisements] tend to mislead or confuse consumers." *Johnson & Johnson * Merck Consumer Pharms. Co. v. Smithkline Beecham Corp.*, 960 F.2d 294, 297 (2d Cir. 1992). The success of an implied claim "usually turns on the persuasiveness of a consumer survey." *Id.* (citing *Coca-Cola Co. v. Tropicana Products Inc.*, 690 F.2d 312, 317 (2d Cir. 1982)).

Plaintiffs in this case allege that defendants' advertisements are literally false. Plaintiffs allege that on January 4, 2007, the moscowcatstheatre.com website, then controlled by defendants, stated that the "the international sensation from Russia will extend its sold out National Tour." Compl. Ex. C. This statement indicates to the reader that the performances put on by defendants are a continuation of the performances put on by plaintiffs, which plaintiffs allege is false.

Plaintiffs also allege that defendant's advertisements contained implicit falsehood, stating that defendants continue to use the "Moscow Cats Theatre" mark in conjunction with images of the plaintiffs in order to advertise defendants' performances, giving the false impression that plaintiffs are connected with

defendants' performances. Compl. at ¶ 73. Customers were confused by these advertisements. Plaintiffs have sufficiently made out a claim for implied falsity.

Defendants argue that plaintiffs can only establish their claim of false advertising through a survey, and state that unspecific reports of consumers experiencing confusion are not sufficient. Defendants misconstrue the standard. At this stage plaintiffs need only state that there was confusion and offer facts to support that claim. Moreover, if the plaintiffs can demonstrate that defendants have "intentionally set out to deceive the public," then no survey is required. *Johnson & Johnson v. Merck*, 960 F.2d 294, 298 (2d Cir. 1992).

*Unfair Competition*

In order to establish unfair competition under the Lanham Act, a plaintiff must show that a defendant: (1) made false or misleading factual representations regarding the nature, characteristics, or qualities of plaintiff's goods or services; (2) used the false or misleading representations "in commerce"; (3) made the false or misleading representations in the context of commercial advertising or commercial promotion; and (4) made the plaintiff believe that it was likely to be damaged by the false or misleading factual representations. *Towers Fin. Corp. v. Dun & Bradstreet, Inc.,* 803 F.Supp. 820, 823 (S.D.N.Y. 1992)

(citing *McNeil-P.C.C., Inc. v. Bristol-Myers Squibb Co.*, 938 F.2d 1544, 1548-49 (2d Cir. 1991)). As discussed above, plaintiffs have offered facts to show that defendants made false representations regarding the nature of their performances, that these representations were used in commerce, and that they were done in the context of commercial advertising. In addition, plaintiffs clearly believe that they are likely to be damaged by these false representations, since audience members are confusing defendants' allegedly inferior performances with plaintiffs' performances.

*Trade Dress Infringement*

Plaintiffs allege that defendants have infringed on plaintiffs' trade dress by copying the costume worn by Kuklachev when performing as a clown in their performances and by copying combination of colors, fonts, and images used in advertisements. The term "trade dress" refers to "how a product looks, its total image, or its overall appearance. As such, it includes a product's 'composition and design, including size, shape, color, texture and graphics.'" *Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1068 (2d Cir. 1995) (quoting *Coach Leatherware Co., Inc. v. AnnTaylor, Inc.*, 933 F.2d 162, 168 (2d Cir. 1991). In order to prevail in a trade dress infringement suit under § 43(a), plaintiff must prove that the identifying mark is

distinctive, either because it is itself inherently distinctive, or because it has become distinctive by acquiring a secondary meaning. *Mana Prods. v. Columbia Cosmetics Mfg.*, 65 F.3d 1063, 1068 (2d Cir. 1995) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 769, 112 S. Ct. 2753; 120 L. Ed. 2d 615 (1992)). A trade dress is inherently distinctive when its marks are "suggestive and arbitrary or fanciful," and not inherently distinctive when its marks are descriptive or generic. *Paddington Corp.*, 996 F.2d at 583 (citing *Abercrombie & Fitch Co.*, 537 F.2d at 9). Second, plaintiff must show that a likelihood of confusion exists between its product and the defendant's. *Id.* Additionally, plaintiffs must establish that "the matter sought to be protected is not functional." 15 U.S.C. § 1125(a)(3).

Plaintiffs have made a showing that audience members were confused about whose performances they were attending. It is not possible to determine at this stage whether the confusion was due to similarities in costumes or advertising materials. However, since some amount of confusion between the performances is evident, plaintiffs have sufficiently shown a likelihood of confusion.

The distinctive elements of the clown costume and advertisements are non-functional.

The remaining issue is whether the trade dress is

distinctive. Kuklachev wears clothing commonly worn by clowns, including colorful clothing, oversized shoes, a bow-tie and tail-coat with oversized lapels, and pants that are shortened to emphasize the oversized shoes. Compl. at ¶ 175. In addition, there are several distinctive features of the costume, including the "notes of traditional European style, reminiscent of the age of romanticism," the use of a wide girdle, white frilled shirt, the old-fashioned lapels, and bright yellow pants. *Id.* Plaintiffs have identified enough distinctive elements of Kuklachev's costume to state a claim for trade dress infringement with regards to the costumes.

Plaintiffs state that they have adopted a "particular design and a combination of colors" to advertise their performances to the public in posters and other graphic materials. Compl. at ¶ 176. Most advertising materials emphasize red and yellow, with some greens and oranges. *Id.* They feature a yellowish background of cats pictured in halftones. *Id.* One cat stands out from the crowd with bright green eyes. *Id.* The words "Moscow Cats Theatre" are printed in a distinctive style and unusual font. *Id.* While each of these elements is not inherently distinctive, together they may create a distinctive whole. Plaintiffs have stated a claim for trade dress infringement with regards to the advertisements.

*Disposition*

Based on the foregoing, the motion to dismiss Claims II, III, and XII of the complaint is denied.

**4. Trademark Dilution (Claim IV)**

"The Dilution Act... differs from traditional trademark law in that the class of entities for whose benefit the law was created is far narrower." *Tcpip Holding Co. v. Haar Communs.*, 244 F.3d 88, 95 (2d Cir. 2001). To succeed on a claim for dilution, a plaintiff must show that its mark has a "'significant degree of inherent distinctiveness'" and that it is "truly famous," possessing "'a high degree of... acquired distinctiveness.'" *Savin Corp. v. Savin Group*, 391 F.3d 439, 449 (2d Cir. 2004) (quoting *TCPIP Holding Co.*, 244 F.3d at 97, 98). "The degree of fame required for protection under the FTDA must exist in the general marketplace, not in a niche market. Thus, fame limited to a particular channel of trade, segment of industry or service, or geographic region is not sufficient to meet that standard." *Id*. at 450, n.6.  Examples of famous marks include Dupont, Buick, and Kodak. *Tcpip Holding Co.*, 244 F.3d at 99.

The "Moscow Cats Theatre" mark has acquired distinctiveness through secondary meaning. Therefore, it does not qualify for protection from dilution under the Lanham Act. Furthermore, there is no evidence to indicate that the "Moscow Cats Theatre" mark is

"truly famous." The motion to dismiss Claim IV of the complaint is granted.


**5. Cybersquatting (Claim V)**

To make out a cybersquatting claim, courts in this circuit consider (1) whether the mark is distinctive or famous; (2) whether the domain name is identical or "confusingly similar" to the mark; and (3) whether the domain name registrant acted with a "bad faith intent to profit" from the mark when it registered the domain name. *Sporty's Farm L.L.C. v. Sportsman's Market, Inc*., 202 F.3d 489 (2d Cir. 2000). In determining whether a person has a bad faith intent when registering or using a domain name, a court is encouraged to consider various factors, including the trademark or intellectual property rights of the person, if any, in the domain name and any other factors it considers pertinent. 15 U.S.C. § 1125(d)(1)(B). Bad faith intent "shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(2).

Plaintiffs claim that the Gelfmans used the www.moscowcatstheatre.com domain name to promote their allegedly infringing performances. Plaintiffs have made a sufficient showing regarding the distinctiveness of the  "Moscow Cats

Theatre" mark, and the domain name is identical to the mark. Plaintiffs have also sufficiently alleged bad faith.

Gelfman registered the domain [www.moscowcatstheatre.com](www.moscowcatstheatre.com) in order to promote performances by the plaintiffs; during the 2005 and 2006 seasons, the site was devoted entirely to performances by the Moscow Cats Theatre under Kuklachev's direction. Compl. at ¶ 68. Defendants argue that the fact that Gelfman registered the domain name in good faith (for the 2005 and 2006 tours) prevents plaintiffs from arguing that defendants acted in bad-faith. D. Mem. at 31. However, plaintiffs need not show bad faith from the beginning. *See Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 385 (2d Cir. 2003) ("Congress intended the cybersquatting statute to make rights to a domain-name registration contingent on ongoing conduct rather than to make them fixed at the time of registration."). Defendants additionally maintain that Gelfman's filing for trademark rights established reasonable grounds for him to believe that the use of the domain name was fair use or lawful. Defendant cites *Coca-Cola Co. v. Purdy*, 382 F.3d 774, 788 (8th Cir. 2004), where the court found that a defendant's stated belief that his cyberquatting actions were protected by the First Amendment was not reasonable, given the repeated complaints and warnings from the plaintiffs that such conduct was unlawful. *Coca-Cola* thus supports plaintiffs' position, not defendants'. The motion to dismiss the cybersquatting claim is denied.

**B. Copyright Infringement (Claim XI)**

To withstand a motion to dismiss for failure to state a claim, a copyright infringement claim must allege: "1) which specific original works are the subject of the copyright claim, 2) that plaintiff owns the copyrights in those works, 3) that the copyrights have been registered in accordance with the statute, and 4) by what acts during what time the defendant infringed the copyright." *Kelly v. L.L. Cool J.*, 145 F.R.D. 32, 36 (S.D.N.Y. 1992) (citations omitted), *aff'd*, 23 F.3d 398 (2d Cir. 1994). The Digital Millennium Copyright Act ("DMCA") states that "no action for infringement of the copyright in any United States work shall be instituted until preregistration or registration of the copyright claim has been made." 17 U.S.C. § 411. This registration requirement is "more akin to a claim-processing rule than a jurisdictional prerequisite." *Muchnick v. Thomson Corp.*, 509 F.3d 116, 133 (2d Cir. 2007). Under the clear language of the statute, which refers only to "any United States work," foreign works originating in countries party to the Berne Convention need not comply with § 411. *Id.* The DMCA defines a "United States Work" as one first published in the United States. 17 U.S.C. § 101. "Publication" is defined as the distribution of copies or phonorecords of a work to the public by sale or other transfer of ownership, or by rental, lease, or lending. *Id*. "A public performance or display of a work does not of itself constitute

publication." *Id*. In the case of an unpublished work, for the work to be considered a United States work, all the authors of the work must be nationals, domiciliaries, or habitual residents of the United States. *Id*.

Plaintiffs have not specified all of the individual materials and performance elements that they claim were copied by defendants. While "Rule 8 of the Federal Rules of Civil Procedure requires that the particular infringing acts be set out with some specificity... and broad, sweeping allegations of infringement do not comply," *Carell v. Shubert Org*., 104 F. Supp. 2d 236, 251 (S.D.N.Y. 2000) (internal citations omitted), the allegations in this case are sufficient under Rule 8 to give the Defendants "fair notice of what the... claim is and the grounds upon which it rests." *Bell Atl. Corp*., 127 S. Ct. at 1964 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47; 78 S. Ct. 99; 2 L. Ed. 2d 80 (1957)) (alteration in original).

Plaintiffs allege that they are the authors of all works sought to be protected under the copyright claim. Plaintiffs further allege that defendants copied all or part of plaintiffs' performances, including key tricks, sketches, themes, stage setup and design, the build of the cast, costumes, and other major elements of the show, for use in performances that took place on various dates in 2007, in violation of plaintiffs' copyright in these materials. Compl. at ¶ 164. Overall, plaintiffs state that

defendants' shows are strikingly similar and in large part identical to plaintiffs' show, exuding the same "look and feel" as plaintiffs' copyrighted material. *Id.* at ¶ 165. Plaintiffs additionally claim that defendants commercially utilized plaintiffs' promotional materials, including photographs, drawings, posters, t-shirts, brochures, video recordings of performances. *Id.* at ¶ 166.

Plaintiffs need not comply with the regulation requirement, because the works are foreign works. Plaintiffs' show, the decorations, the letter designs, the English-language posters, the tricks, Kuklachev's books, Kuklachev's photographs, Moscow Cats Theatre promotional pamphlets, video recordings of Kuklachev's performances, and the scenic painting used in the show were developed in Russia, Supplemental Declaration of Yuri Kuklachev, submitted January 29, 2009, which is a party to the Berne Convention, and are thus exempt from the requirements of § 411.

Defendants claim that plaintiffs' 2005 and 2006 performances, including their storylines, tricks, scene layout, background decorations and costumes, were 'published' in the United States, by virtue of being performed in the United States. This interpretation is contradicted by the clear language of the DMCA, which states that performance does not constitute publication. 17 U.S.C. § 101. Defendants additionally argue that

their only opportunity to copy plaintiffs' works was in the United States, and therefore the works are United States works. This claim finds no support in law or logic. The location where the work was copied does not determine the protections afforded to that work. Furthermore, plaintiffs have indicated in their complaint and supporting papers that members of defendants' cast had been familiar with plaintiffs' work for years. One clown in particular, defendant Krasnolozhkin, allegedly performed plaintiffs' material in Russia.

Defendants maintain that plaintiffs' performances were not "fixed in any tangible medium of expression," as required by the DMCA for copyright protection. *See* 17 U.S.C. § 102. Plaintiffs counter that their performances of the same and similar shows performed prior to 2005, containing the same storylines, tricks, and other elements, are fixed on videotapes in Russia.

The motion to dismiss Claim XI of the complaint is denied.

**C. State Law Claims**

**1. Privacy and Publicity Rights (Claim VI)**

New York Civil Rights Law, Article 5, § 51, provides:

Any person whose name, portrait, picture or voice is used within this state for advertising purposes or for the purposes of trade without the written consent first obtained as above provided may maintain an equitable action in the

supreme court of this state against the person, firm or

corporation so using his name, portrait, picture or voice,

to prevent and restrain the use thereof; and may also sue

and recover damages for any injuries sustained by reason of

such use.

N.Y. CLS Civ. R. § 51 ("§ 51").  Where the unauthorized use of

name or picture has been purely for advertising purposes, "relief

from such commercial exploitation has been liberally granted."

*Paulsen v. Personality Posters, Inc.*, 299 N.Y.S.2d 501, 505, 59

Misc. 2d 444 (Sup. Ct. 1968). The purpose of § 51 is "remedial;"

the statute allows a person "to be immune from commercial

exploitation." *Onassis v. Christian Dior-New York, Inc.*, 472

N.Y.S.2d 254, 258 (Sup. Ct. 1984). In *Radio Today, Inc. v*

*Westwood One, Inc.*, 684 F.Supp. 68, 74-75 (S.D.N.Y. 1988), the

Court found that plaintiff had stated a cause of action under §

51, where plaintiff alleged that defendant deliberately

mislabeled a recording sold to a radio program with plaintiff's

name in order to commercially exploit the goodwill and reputation

attached to plaintiff and to pass off a the program as

defendant's own.

Plaintiffs have alleged that defendants deliberately

distributed advertising materials containing names, pictures, and

portraits of the plaintiffs, in order to commercially exploit

plaintiffs' goodwill and reputation and to create the false

impression that plaintiffs endorsed or were otherwise connected with defendants' performances, all without written consent. Compl. at ¶ 133, 135, 140. Plaintiffs have pointed to a specific example of a poster displaying an image of Kuklachev used in conjunction with two performances in 2007, where plaintiffs had no involvement in the show. *Id.* at ¶ 71. Defendants have not used plaintiffs' names or images in connection with newsworthy events or in an incidental manner. *Id.* at ¶ 142, 143. The motion to dismiss Claim VI of the complaint is denied.

## 2. Injury to Business Reputation and Trademark Dilution under New York Law (Claim VII[14])

Under § 360-L of New York's General Business Law, a "[l]ikelihood of dilution of the distinctive quality of a mark or trade name shall be a ground for injunctive relief... notwithstanding the absence of competition between the parties or the absence of confusion as to the source of goods or services." N.Y. Gen. Bus. Law § 360-L. New York law protects against dilution by either blurring or tarnishment when marks are either inherently distinctive or distinctive as a result of secondary meaning. *New York Stock Exch., Inc. v. New York, New York Hotel, LLC*, 293 F.3d 550, 557 (2d Cir. 2002). Courts look to the

---

[14]Plaintiffs' claims for injury to business reputation and dilution under § 360-L of New York's General Business Law are essentially equivalent. Both require the same elements of proof. *See Savin Corp. v. Savin Group*, 391 F.3d 439, 455 (2d Cir. 2004).

similarity of the marks and of the products covered, the sophistication of consumers, the existence of predatory intent, and the relative renown of the compared marks. *Id.* at 558.

Plaintiffs have made a showing that their marks are distinctive through secondary meaning, as discussed above. Plaintiffs have alleged that audience members were dissatisfied with defendants' performances and held plaintiffs responsible, contacting plaintiffs' theater in Moscow to demand their money back. Compl. at ¶ 70. Defendants have thereby allegedly tarnished plaintiffs' reputation. Defendants have not argued that their actions fall into the fair use exception. The motion to dismiss Claim VII of the complaint is denied.

## 3. Unfair Competition and False Advertising Under New York Law (Claim VIII)

The unfair competition claim is subsumed within the discussion for Claim VII, as N.Y. Gen. Bus. Law § 350-L is the section that covers unfair competition.

Plaintiffs claim false advertising under statutes contained in the New York Consumer Protection Law that prohibit deceptive practices and false advertising. These statutes read, in relevant part:

> Deceptive acts or practices in the conduct of any business,
> trade or commerce or in the furnishing of any service in

this state are hereby declared unlawful.


N.Y. Gen. Bus. Law § 349;

> The term "false advertising" means advertising... [that] is
> misleading in a material respect. In determining whether any
> advertising is misleading, there shall be taken into
> account... not only representations made by statement, word,
> design... or any combination thereof, but also the extent to
> which the advertising fails to reveal facts material in the
> light of such representations with respect to the
> commodity... to which the advertising relates under... such
> conditions as are customary or usual.

N.Y. Gen. Bus. Law § 350-a. N.Y. Gen. Bus. Law § 350 makes false
advertising unlawful.

"To prevail in a cause of action under General Business Law
§§ 349 and 350, the plaintiff must prove that the defendant made
misrepresentations or omissions that were likely to mislead a
reasonable consumer in the plaintiff's circumstances... and that
as a result the plaintiff suffered injury." *Solomon v. Bell Atl.
Corp*., 9 A.D.3d 49, 55, 777 N.Y.S.2d 50 (App. Div. 1st Dept.
2004) (citing *Goshen v Mutual Life Ins. Co*., 98 N.Y.2d 314, 325,
774 N.E.2d 1190, 746 N.Y.S.2d 858 (N.Y. 2002)). New York courts
apply the statute broadly. *Karlin v. IVF Am., Inc*., 93 N.Y.2d
282, 290-91, 712 N.E.2d 662; 690 N.Y.S.2d 495 (1999). A plaintiff

must charge conduct of the defendant that has a broad impact on consumers at large, rather than conduct that pertains to private disputes between the parties. *Oswego Laborers' Local 214 Pension Fund v Marine Midland Bank*, 85 N.Y.2d 20, 25, 623 N.Y.S.2d 529, 647 N.E.2d 741 (N.Y. App. 1995) (referring to the purpose of the overall section of which § 350 and 350-a are contained). Corporate competitors "have standing to bring a claim under this [statute]... so long as some harm to the public at large is at issue." *Securitron Magnalock Corp. v. Schnabolk*, 65 F.3d 256, 257 (2d Cir. 1995) (quotations omitted). The relevant question "is whether the matter affects the public interest in New York, not whether the suit is brought by a consumer." *Id*. at 257.

Plaintiffs have alleged that consumers were deceived by advertising materials distributed by defendants that included images of the plaintiffs and that were designed in the distinctive style used by plaintiffs for prior performances. Such advertising materials would be likely to mislead a consumer in ordinary circumstances into believing that the plaintiffs were associated with the performances. Plaintiffs have alleged consumer injury in claiming that dissatisfied audience members demanded their money back. Compl. at § 70. Plaintiffs have thus plead sufficient facts to make out a claim for false advertizing under New York law.

In addition to their state law claims, plaintiffs also claim

unfair competition and false advertising under New York City Administrative Code § 20-700. A claim under that section may only be brought by the Commissioner of Consumer Affairs. New York City Administrative Code § 20-703(c); *Collier v. Home Plus Assoc., Ltd.*, 2007 NY Slip Op 52526U at *6, 856 N.Y.S.2d 497 (Sup. Ct. 2007).

Defendants' motion to dismiss Claim VIII of the complaint is denied with respect to the State law claims and granted with respect to the New York City Administrative Code claim.

## 4. Common Law Unfair Competition (Claim IX)

"To prevail on a claim for unfair competition under New York common law, a plaintiff must couple its evidence supporting liability under the Lanham Act with additional evidence demonstrating the defendant's bad faith." *Omicron* 433 F.Supp.2d at 395; *see also Philip Morris USA Inc. v. Felizardo*, 2004 U.S. Dist. LEXIS 11154 (S.D.N.Y. June 18, 2004). In addition to offering facts that, if proved, establish liability under the Lanham Act, plaintiffs have made a showing that defendants intentionally associated defendants' shows with those of plaintiffs by performing the show under the mark "Moscow Cats Theatre," dressing performers to look like those in plaintiffs' shows, using plaintiffs' scenic materials developed especially for plaintiffs' shows, and using plaintiffs' likenesses and

designs in their advertising materials. Overlap between customers is indicated by plaintiffs' claim that audience members contacted plaintiffs to demand their money back after purchasing tickets for the defendants' shows. *Id.* at ¶ 70. These facts are sufficient to make out a State law unfair competition claim. The motion to dismiss Claim IX of the complaint is denied.

## 5. Unjust Enrichment under New York Common Law (Claim X)

To succeed on a claim of unjust enrichment, "plaintiff must show that (1) defendant was enriched (2) at plaintiff's expense, and (3) that it is against equity and good conscience to permit... defendant to retain what is sought to be recovered." *Lake Minnewaska Mountain Houses Inc. v. Rekis*, 259 A.D.2d 797, 798, 686 N.Y.S.2d 186 (App. Div. 1999) (quotations omitted); *accord Golden Pacific Bancorp v. FDIC*, 273 F.3d 509, 519 (2d Cir. 2001). The theory of unjust enrichment lies as a quasi-contract claim. It is an obligation the law creates in the absence of any valid and enforceable contract, whether written or implied-in-fact. *See Beth Isr. Med. Ctr. v. Horizon Blue Cross & Blue Shield of N.J., Inc.*, 448 F.3d 573, 586-87 (2d Cir. 2006).

Plaintiffs state that defendants have appropriated their persona, goodwill and reputation and have thereby gained a benefit, since audience members attended performances and bought goods such as t-shirts and brochures on the basis of the

representation that plaintiffs were somehow involved in the
performances. Compl. at ¶ 160, 161. Defendants argue that because
New York does not recognize a common-law right of privacy, the
only remedy for plaintiffs' claim regarding non-consensual
commercial uses of plaintiffs' name and likeness lies in the New
York Civil Rights Law, discussed above. D. Mem. at 36. Reading
this claim in the light most favorable to plaintiffs, drawing
facts from elsewhere in the complaint,[15] plaintiffs have stated a
claim that defendants were unjustly enriched by profits from
their allegedly infringing shows. The profits gained by
defendants form these performances came at plaintiffs' expense,
since plaintiffs planned to return to the United States for a
2007 tour and would have been the ones profiting from those
performances had it not been for defendants' actions.[16]
Plaintiffs may argue that it is against equity to permit
defendants to retain those profits. The motion to dismiss Claim X
of the complaint is denied.


## 6. Fraud (Claim XIII) and Conversion (Claim IV)

As discussed previously, these claims must be arbitrated

---

[15]The facts stated in Claim X of the complaint pertain to
misappropriation.

[16]Plaintiffs were unable to cover, since promoters are unwilling to
promote plaintiffs' performances in the United States for fear of possible
trademark infringement suits while defendant's trademark application is
pending. Compl. at ¶ 209

under the contract.

**7. Fraud in Trademark Application (Claim XV)**

Under federal law, "[a]ny person who shall procure registration in the Patent and Trademark Office of a mark by a false or fraudulent declaration or representation, oral or in writing, or by any false means" is liable in a civil action "by any person injured thereby for any damages sustained in consequence thereof." 15 U.S.C. § 1120. "[T]o 'procure' registration means to obtain registration, not merely to apply for registration." *Tiny Tot Sports, Inc. v. Sporty Baby, LLC*, 2005 U.S. Dist. LEXIS 18137 at *15 (S.D.N.Y. August 24, 2005) (citing *Country Mut. Ins. Co. v. Am. Farm Bureau*, 876 F.2d 599, 600-01 (7th Cir. 1989)).

In his application for the Moscow Cats Theatre trademark, defendant Gelfman submitted a poster bearing a large photograph of plaintiff Dmitri Kuklachev as a sample of prior use of the mark. Compl. at ¶ 199. In addition, Gelfman included pictures of plaintiffs performing various tricks and reviews of plaintiffs' performances. *See id.*[17] Plaintiffs allege that this submission falsely suggested a connection between defendant Gelfman and

---

[17]*See also* United States Patent and Trademark Office file for Gelfman's application to use the Moscow Cats Theatre mark, application Serial No. 77075635, available at http://tmportal.uspto.gov/external/portal/tow?SRCH=Y&isSubmitted=true&details=&SELECT=US+Serial+No&TEXT=77075635#.

plaintiffs' names and identities, in addition to falsely
representing that Gelfman was the owner of the mark. However,
defendants' application has not been approved. Plaintiffs allege
that registration of the mark by defendants would cause them
great damage, and that while defendants' application is pending
at the Patent Office, promoters are unwilling to promote
plaintiffs' performances for fear of possible trademark
infringement suits. *Id*. at ¶¶ 208, 209. Plaintiffs have initiated
proceedings before the Trademark Trial and Appeal Board of the
United State Patent and Trademark Office, opposing the
registration of the "Moscow Cats Theater" trademark by Gelfman.
*Id*. at ¶ 81. The Appeal Board is best equipped to address
plaintiffs' objections, including any allegations of fraud or
falsity, in their determination of whether registration is
proper.[18]  The motion to dismiss Claim XV of the complaint is
granted.


**8. Prima Facie Tort (Claim XVI)**

"The elements of a cause of action for prima facie tort
under New York law are: (1) the intentional infliction of harm,

---

[18]In *Country Mutual*, the Seventh Circuit discussed the text and
legislative history of the statute in support of its reading. 876 F.2d at 600-
01. The court additionally reasoned that "[c]ompeting firms would be injured
by the registration and use of the mark, not by the application itself." 876
F.2d at 600. In this case, plaintiffs have alleged that they are suffering
damages while Gelfman's trademark application is pending. However, plaintiffs
have not made the argument that despite the pending application, the statute
gives them a cause of action here. Accordingly, I will not disturb the
consensus regarding the interpretation of 'procure' in the statute.

(2) which results in special damages, (3) without any excuse or justification, (4) by an act or series of acts which would otherwise be lawful. In addition, the complaint must allege that defendants were motivated solely by the malicious intention to injure the plaintiff." *McKenzie v. Dow Jones & Co.*, 2008 U.S. Dist. LEXIS 55387 at *7 (S.D.N.Y. July 22, 2008)(citing *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 142-43, 480 N.E.2d 349, 490 N.Y.S.2d 735 (1985)). "Special damages" is defined as a "specific and measurable loss," *Freiholer*, 65 N.Y.2d at 143, and "must be alleged with sufficient particularity to identify actual loses and be related causally to the alleged tortious acts." *McKenzie*, 2008 U.S. Dist. LEXIS 55387 at * 7 (quoting *D'Angelo-Fenton v. Town of Carmel*, 470 F. Supp. 2d 387, 401 (S.D.N.Y. 2007)). "Broad and conclusory terms... are insufficient to fulfill this element." *Id.* "Disinterested malevolence" is critical to this cause of action; "the plaintiff cannot recover unless the defendant's conduct was not only harmful, but done with the sole intent to harm." *Twin Labs., Inc. v. Weider Health & Fitness*, 900 F.2d 566, 571 (2d Cir. 1990). "[M]otives other than disinterested malevolence, such as profit, self-interest, or business advantage will defeat a prima facie tort claim." *Id.* (quotation marks omitted).

Plaintiffs have not stated any facts or allegations in their claim for prima facie tort. They have failed to indicate what

actions constitute the intentional infliction of harm. Furthermore, they fail to state with particularity special damages and they have provided no facts in the complaint that would support a finding of disinterested malevolence. To the contrary, all the facts that have been pleaded indicate that defendants were motivated in their actions by profit, self-interest, and business advantage. Last, plaintiffs have claimed that the actions complained of are unlawful under state and federal laws, which disables them from proving the fourth element. Accordingly, the motion to dismiss Claim XVI of the complaint is granted.

## CONCLUSION

For the reasons stated above, the Gelfmans' motion to dismiss pursuant to Rule 12(b)(6) is granted with respect to Claim IV, the part of Claim VIII asserting a claim under New York City's Administrative Code, Claim XV, and Claim XVI, and is denied with respect to all other claims. The motion to compel arbitration is granted with respect to Claim XIII and Claim XIV, and the litigation is stayed with respect to those claims only. The motion to dismiss pursuant to Rule 9(b), Rule 12(e), Rule 12(b)(1), and Rule 12(b)(3) is denied. The Clerk is directed to transmit a copy of the within to all parties and the assigned magistrate judge.

SO ORDERED.

Dated:     Brooklyn, New York
           February 26, 2009


                    By: /s/ Charles P. Sifton (electronically signed)
                            United States District Judge